CHARLES E. QUINCEY *against* JOSEPH F. YOUNG, WILLIAM S. WOODWARD, AND STEPHEN V. WHITE.*

A judgment in an action tried before a referee will not be reversed on account of the erroneous admission of evidence, if the referee was not influenced by such evidence, and in order to determine this question, the court on appeal will examine the opinion of the referee giving his reasons for his decision.

In an action to charge several persons as joint partners in a stock speculation, in which plaintiffs were employed as brokers, and in which the defense was that each of the defendants was, by special agreement, liable for his own share only: *Held*, that it was competent for the plaintiffs to show that one of the defendants had a separate individual stock account with them.

Where, from the whole evidence, the appellate court can see that a referee was justified in finding as he did on a disputed question of fact, the judgment entered on his report will not be reversed, although it appears by his opinion that his deductions from particular circumstances may have been erroneous.

Notwithstanding the power given to the court by § 268 of the Code of Procedure, to review questions of fact on appeal from a judgment rendered after a trial before a referee, the appellate court will not consider the weight of the evidence as if it were a new question, and where there is a direct conflict of positive testimony on a material point, will refuse to disturb the finding of the referee as to the facts.

APPEAL by defendants from a judgment of this court entered on the report of a referee.

The action was brought to recover for moneys advanced, brokers' commissions, &c., due the plaintiff under the following facts as found by the referee:

In April, 1870, Young and Woodward employed the firm of Heath & Co., composed of William Heath and the plaintiff, to buy and sell for their account the stock of the Philadelphia and Reading Railroad Company, the commission to be one-thirty-second of one per cent. on the par value. Heath & Co. bought and

---

* On appeal to the Court of Appeals, the judgment of the general term here was modified by disallowing the recovery for the $5,380, claimed to have been paid to White, but in all other respects the judgment was affirmed (decision rendered December 14th, 1875).

sold said stock during April and up to May 17th, on account of Young and Woodward. On May 17th these two agreed with defendant White that he should take part in the speculation, and the brokers were authorized to transfer 40,141 shares then on hand to the new account at the rate of $52 per share, ·charging up their commissions on the transfers. The brokers rendered accounts from time to time, which were approved by defendants. On July 6, 1870, 30,300 shares, owned by defendant Young individually, were transferred to the joint account at $53 62½ per share, and Heath & Co., by agreement, charged the joint account with their commissions upon the transfer.

On July 14, 1870, the defendants instructed Heath & Co. to make up the joint account and divide the stock into three equal parts, in order that each might take and pay for his share. While this was being done, Young announced his inability to pay for his share. Woodward and White took up and paid for their shares of the stock, and requested Heath & Co. to " carry " the share of Young, promising that, should the stock fall below ninety-five per cent., they would take it off their hands. This was agreed to. It was afterward discovered that 11,200 shares of Young's stock, which went to make up the 30,300 shares above referred to, was in the hands of other brokers ; his account was therefore, with his consent, charged with that number at $53 62½ per share. Up to July 23, 1870, Heath & Co. sold parts of the stock they were carrying, under direction of Woodward and White, and credited the proceeds to the joint account. Upon that date, the stock having fallen below 95 per cent., they required the defendants Woodward and White to take it off their hands as agreed, and pay the balance due on account, who offered to take the stock then on hand at $47 50 per share, if that would end their liability, but refused to do otherwise. Heath . & Co., upon notice to them, then sold out the stock at the Stock Exchange, and the larger part of it was bought in by defendants. On July 27th, 1870, Heath & Company rendered an account, by which it appeared that defendants were indebted to them on the joint account in the sum of $104,138 39. Defendants ap-

proved the account, but asserted that they were not jointly liable thereon. Heath & Co. subsequently paid out $294 for brokers' commissions on account of the joint account of the defendants. Heath & Co. also claimed to have paid the defendant White $5,380 for money loaned by him to the joint account.

Heath & Co. assigned their claim to the plaintiff, who brought this action.

The defense was that, by a special agreement made with Heath & Co., the defendants were only liable individually each for his own proportion; that Heath & Co. had agreed to look to each for his own share; and in support of this they endeavored to show, 1. That such was the original agreement, and 2. That on July 15th, 1870, there had been an accord and satisfaction as to all past transactions, and an agreement for separate liability for the future.

On the trial the plaintiff Quincey was introduced as a witness on his own behalf, and upon his examination in chief was asked, " What would be the effect of the transfer of the 30,300 shares to the joint account? " A general objection to this question, interposed on behalf of all the defendants, was overruled by the referee, and the defendants severally excepted. The witness answered, " It would have been to the benefit of the pool account." Upon his second redirect examination, this question was put to him : " You have stated, in answer to defendants' counsel, that Mr. Young had a private account with your house, and that that private account was opened about the time the Woodward and Young joint account was closed, and that the margin put up for that account was Young's proportion of the profit on that joint account transaction; now I ask you, whether at the same time, any private account with your house was opened for Woodward ? " To this question the defendants objected on the grounds that it was irrelevant, and that it was not in rebuttal of anything which had been called out by them. These objections were overruled, and the defendants severally duly excepted. The witness answered, " Yes, sir." He was then asked, " And did Woodward put up any margin on that private account, and if so, what was

it ? " and answered "None." "Were these two private accounts of Woodward and Young running while this joint account of Young, Woodward and White was running ? " Answer. "Yes, sir." To both of these questions the same objections were taken as to the first ; there was the same ruling, and the defendants duly severally excepted.

After the defendants had rested, Quincey was recalled, and testified as follows: " *Q.* Did you, on the 15th, know of, or at any time assent to, an arrangement that Heath & Co. should stand in the shoes of Young, bearing his losses, and taking his profits ? " " *A.* No, sir." " *Q.* Did you hear that any such claim was made, until some days after July 15th ? " " *A.* No, sir." " *Q.* On what day, according to your best recollection, did you first hear that any such claim was made, that such an arrangement had been entered into ? " " *A.* I think it was the day before the stock was sold out under the rule, at the board." To each of these questions the defendants objected as immaterial and irrelevant. The objection was overruled and defendants excepted.

The evidence relied on to establish the defense, and that to refute it is fully discussed in the opinion.

The referee reported in favor of the plaintiff for $121,157 51, the full amount claimed, and from the judgment entered on his report the defendants separately appealed.

*John H. Bird*, for appellant Young.

*Luther R. Marsh*, for appellant Woodward.

*B. F. Blair*, for appellant White.

*Augustus F. Smith*, for respondent.

J. F. DALY, J.—There was no error committed by the referee in admitting or rejecting evidence which would warrant a reversal of this judgment. We are referred by appellants to the exceptions taken by them to the referee's rulings, at folios 571, 649–51, and 1264–67 of the case.

Quincey v. Young.

As to the first : The evidence was not material, and did not influence or affect in any respect the judgment or decision of the referee, so far as appears from his opinion, and that opinion may be referred to to ascertain whether it did or did not, since the defendants rely on it to show on what ground he really did decide the case. The *question*, " What would be the effect of the transfer of the 30,000 shares to the joint account ? " which was objected to, did not necessarily call for an *opinion* of the witness, although he gave an opinion in his answer to it. It might and could require simply a statement as to the state of the account of the defendants after such transfer, and involve merely a calculation which anybody could make. The answer, which contained the opinion objected to on this appeal, was suffered by defendants to stand without any motion to strike it out.

As to the second exception, it may also be said that the evidence objected to did not influence the decision of the referee, if his opinion be taken into account. But apart from that, I am of opinion that it was proper. So far as it was not in rebuttal, but rather a part of plaintiff's case, it was in the discretion of the referee to allow it in that stage of the trial. So far as the relevancy of the testimony goes, I think it was properly allowed, since it was competent to show (in support of plaintiff's claim, that the account in suit was a joint one of Young, Woodward and White, and not several as to each) that Woodward had at the same time, a separate individual account with plaintiff's house. The same fact had been proved as to defendant Young.

As to the third exception, the questions were proper. They were intended to draw out the fact that the plaintiff at the time of making the agreement of July 15th, alleged by defendants, knew nothing of such an arrangement. The defendant White swore that the plaintff was present at the interview at which the alleged agreement was made, and was consulted by Heath, his partner. This evidence was proper to show that Quincey heard nothing from the defendant or his partner, on that subject.

There is nothing in the claim made on this appeal by de-

fendants, that the referee, 1st. Erred in assuming that evidence was before him which had not in fact been given, and allowed the supposed evidence to influence his decision; and that, 2d. The referee overlooked and excluded from his consideration important evidence introduced on the part of the defendants, to warrant a reversal of this judgment. The errors complained of may be considered in the order they are treated in the second and third points of the appellants, and the several subdivisions of those points.

*Second point, sub.* 1. There was evidence that the plaintiffs were brokers and not speculators, sufficient to warrant the referee's remark to that effect.

*Sub.* 2. There was evidence that when Heath & Co. asked for margin, their request was acceded to; for Woodward says that he told Quincey when he asked for margin, that "he must look to Young for his share and to me for mine," and this was an *assent* to the demand, although it is true the margin was never given.

*Sub.* 3. There was evidence that Quincey denied the existence of any agreement for limited liability, so far as he knew anything about the agreements with defendants, as appears by his direct examination, where he testifies to what Heath told him in presence of defendant Young, and by his cross-examination, and it cannot be said that his attitude in this controversy was other than a most positive denial of any such agreement for limited liability.

*Sub.* 4. There was evidence that both Heath and Quincey denied the making of the alleged agreement of July 15th, since Heath certainly did deny it, and Quincey denied any knowledge whatever of such agreement on his part, and the language of the referee, that "both Heath and Quincey denied the making of this agreement, and if their version of the transaction is to be believed, nothing was said or done by them upon the settlement in question which can have the effect of discharging the liability of Woodward and White," must be taken as referring, so far as Quincey is concerned, to his denial of taking any part in making, or of any knowledge of any such agreement.

*Sub.* 5. There is evidence that at the time spoken of by the

referee in his opinion, that Heath was acting under legal advice, as the referee stated.

Under the appellant's third point: *Sub.* 1. There is nothing in the remark of the referee in his opinion, speaking of the making of the alleged agreement of July 15th, that, " Young is silent on the subject," to warrant the conclusion that he overlooked Young's testimony as to what Heath told him of the occurrences on that morning. The referee refers merely to the fact, which was not disputed, that although Young was present in the room when the alleged agreement was made, he did not hear anything that was said, and not to the testimony of Young as to what was subsequently told him by Heath. The latter evidence he evidently refers to and disposes of for what, in his judgment, it was worth, by the lines of his opinion which follow the remark above quoted: " In fact, his (Young's) state of mind on that eventful day was such as to render him incapable of participating in what took place, or of *recollecting* with any distinctness what had occurred." There would be no necessity for questioning Young's recollection if the referee had not in view the testimony of Young as to what was said on that day.

*Sub.* 2. The fact that the referee in his opinion states that the defendant White " says nothing as to any allusion being made on this occasion (interview of July 16th) by Heath to the alleged original agreement for limited liability," does not present the shadow of reason for reversing this judgment. It is the fact that White did testify that Heath admitted such original agreement at that meeting of July 16th; Woodward testified to the same effect, and the referee gave full consideration to Woodward's testimony as to what was then admitted. But the referee disbelieved both Woodward and White's testimony as to what the original agreement was, and how can it be said that further testimony of White to admissions of Heath would or could affect a decision founded on the broad disbelief of White's truthfulness? The testimony of White as to Heath's admissions is no stronger, is not as strong, in fact, as the testimony of White concerning the acts and statements of the parties when the original agreement was made. But there is conclusive evidence that the referee's decision was not affected by

even overlooking this testimony of White or of Young as to Heath's admissions. In the concluding portion of his opinion he states that the admission, whatever it was, is not sufficient to establish an undertaking which, in his opinion, had not been previously made, thus giving full effect to all the evidence given by defendants as to the alleged declarations and admissions of Heath on the 15th and 16th of July. Admissions are the weakest of all evidence, and testimony of admissions should be closely scanned. The admission may have been made, and yet be contrary to the fact. The referee's opinion clearly shows that his belief as to the original agreement between the parties, a belief settled after hearing their evidence on the point, was not shaken by any evidence of subsequent admissions, and he gives his reasons for it.

We are next asked to reverse this judgment on the facts, as clearly against the weight of evidence. Upon a careful perusal of the testimony in the cause, aided by the very well prepared points of the appellant's counsel, I am unable to discover any ground of fact whatever for reversing the decision of the referee. Two simple questions of fact were tried in this case: 1st. Was the original agreement between Heath & Co. and the defendants for several and limited, or for joint liability of the latter; 2d. Was there a severance of liability of defendants by agreement between them and Heath & Co., a new contract, and accord and satisfaction on July 15th.

On these questions a large amount of evidence was produced, extending in the printed case to more than 1,200 folios. There were only eleven witnesses examined, the transactions in dispute depending largely on verbal agreements between Heath, the plaintiff's partner, and defendants Young, Woodward and White, few other persons being present. There was a direct and irreconcilable conflict in the statements of Heath and the defendants on all material points. The evidence on which the referee found the facts supporting his judgment was conflicting. That is conceded. It is claimed, however, by appellants, that the version of the transactions by defendants' witnesses is corroborated by other circumstances, and a preponderance of proof in favor of defendants is established. This

must be examined. In most instances Heath is contradicted by Young, by Woodward, by White, or by a majority of them, and sometimes by them and Marvin. But if the referee chose to credit Heath's positive statement in preference to the positive statement of all the others together, this court would not disturb his finding sooner than the finding of a jury. The familiar observations as to the better opportunities of the tribunal which found the facts to judge of the credibility of the witnesses, and of the want of such opportunities in the appellate court need not be repeated here. We have no right to conclude that because the story of one witness appears on paper to be more succinct, straightforward and fluent than another, it embodies the truth of the matters in dispute, as opposed to the statement of another witness which is marked by inaccuracies, or even inconsistencies. No tribunal will or can arrive at the truth from such statements, except the one which hears and sees the witnesses. Should we reverse a judgment because the one party told a fairer and more consistent story than the other, we could do no more than remit the trial again to a tribunal (be it referee or jury) which would again have the right to discredit that story if opposed by a positive statement to the contrary. So much, then, for the criticism of appellants on the comparative straightforwardness of the testimony of Heath, White, Woodward, Young and Marvin. I find that the plaintiff's witness, Heath, is as positive as the defendant Woodward on the question of the occurrences of July 15th; and, as to the latter's testimony as to the original agreement, his statements when not educed by leading questions, were that Heath "assented" to the arrangement, "there was an understanding," and that he gave "the substance" of what was said, and justified the referee's remark as to what Woodward could *positively* swear to. The witness could not in any case " remember the words" that were used. As to corroboration of the statements of defendants, much stress is laid by appellants on Marvin's testimony as corroborative of defendant Woodward on the subject of admissions by Heath on July 16th. Mr. Marvin made a memorandum of the conversation shortly after it occurred, and this writing was put in evidence as proof of a higher na-

ture than the mere recollection of the witnesses. But the paper bore evidence of being manufactured, for it put into the mouth of defendant Woodward words that could not have been uttered by Woodward, viz: that the original agreement was that the parties to the account were to be liable each for *one-third* as his share. Now, as there were but *two* parties to the original account (Young and Woodward, White came in afterwards), the shares could not have been thirds. This is admitted by appellants to be a mistake of Marvin's. It not only justified the referee in rejecting all his testimony, but it cast suspicion on the whole case it was produced to support.

Again, as to corroboration of defendants, that there was no interview on July 21st, as sworn to by Heath. An account of that date was produced by plaintiff, and was the subject of that interview. Appellants say that if Heath had sworn he gave it personally to Woodward, it would tend to confirm his testimony, but they say that Heath only swears that he *sent* that paper by a messenger to Woodward. But there is positive testimony by Heath that he took that account to Woodward at the office of Marvin Bros., and showed it to him on July 21st.

As to the corroboration of either side by the acts of the parties after July 15th, and subsequent to the alleged accord and satisfaction, the proof is not stronger in corroboration of one side than the other. The referee discusses very fully the evidence on this point. He had before him the several accounts rendered after that date by Heath & Co., as well those in which it appeared that there might be an acquiescence in an arrangement to sever the account as those to the contrary. He had the writing signed by Young, of date July 15th, 1870, and the letter of Young of the same date. He gives all these acts due weight, and puts a construction upon them which he lawfully might in making those deductions or inferences which the tribunal that tries the fact may draw from undisputed evidence. That another construction may be put upon them, or that they may lead to other inferences or deductions as well, can be no ground for reversing the judgment. There is not in the whole case any controlling evidence which requires a judg-

ment for defendants. The searching and most elaborate argument of defendants addressed to this court on the facts, is as proper here no doubt as it was before the referee, and I have for my part so treated it, endeavoring to find whether on the evidence the facts were other than as found by him. I cannot say they were. That I might have arrived at a conclusion differing from his would be no ground for reversing this judgment. That the court on this appeal might arrive at such a conclusion, would not justify a reversal. The parties tried the fact before a tribunal to which they were satisfied to submit the questions in dispute, and unless we should find the evidence on which that tribunal arrived at its judgment insufficient to sustain its decision, the judgment should not be disturbed.

I am in favor of affirmance.

DALY, Chief Justice.—After a careful examination of the voluminous testimony in this case, I am of the opinion that the conclusion of the referee cannot be disturbed. The question in the case was a question of fact. It was whether the agreement between Young and Woodward on the one part, to which White subsequently became a party, and William Heath & Co. on the other, was originally, that Woodward and Young were each to be liable only for his portion of the losses which might be incurred, neither of them being answerable for the losses of the other; for if this were not the distinct understanding, they were liable jointly. Whether there was such an agreement or not depended upon the testimony of Woodward and Young, and upon the testimony of White, so far as respects certain admissions alleged to have been made by Heath after White became a party to the contract. Heath testified that he never made the admissions sworn to by White, and as between him and Heath there was conflict upon this point. The agreement was made by Woodward and Young with William Heath & Co., and Heath and Quincey explicitly denied the making of any such special agreement, and the whole of the testimony given by them, whether oral or documentary, was to the effect that the agreement was one of joint liability. As between the parties, therefore, by whom the agreement was made, there was

a direct conflict; Woodward and Young testifying, and Heath and Quincey denying, that the agreement was of the special character above stated. So far, moreover, as the testimony of Woodward corroborated the statement of White, respecting the admissions alleged to have been subsequently made by Heath, Woodward's testimony upon the point was met by the positive denial of Heath that he had ever made such admissions. The whole case turned upon the question whether Heath and Quincey, who composed the firm of William Heath & Co., were to be believed, or the defendants Woodward, Young and White. It was a question of the relative credibility of these respective witnesses, in which we, as an appellate tribunal, have not the advantage which the referee had, who saw the witnesses and heard them testify.

It may be that the rule which justly limits the review of the finding of a jury upon a question of fact, where the evidence has been conflicting, is not to be applied to the same extent to the finding of facts by referees upon conflicting evidence, inasmuch as the code has specifically provided for the review of questions of fact, where the trial is by the court or by referees; probably for the reason that more weight is to be given to the united conclusion of the twelve men who compose a jury, where the evidence has been conflicting, than is to be given, under like circumstances, to a finding by a single judge, or by referees, a tribunal never composed of more than three persons, and which may and generally does, as in this case, consist of but one.

But whether this is so or not, the tribunal before whom witnesses are examined, where, as in this case, they directly contradict each other—the one positively swearing to a certain state of facts, and the other as positively denying that they occurred—is more competent to decide which of the two is to be believed, than an appellate tribunal can possibly be. All that the appellate tribunal has before it is what the witnesses said; but this is not all of which the mind takes cognizance, in deciding upon the credibility of witnesses. The look of a witness, the tones of his voice, and his whole manner upon the stand, have often more effect upon those who have to

pass upon the value of his testimony than what he says, the way in which he gives his evidence frequently affording the highest assurance of truthfulness, or of the want of it. It is, therefore, a very delicate thing for a court of review, where the evidence was conflicting, to assume that the finding was erroneous, and there must be a great deal more than there is in this case, to justify the setting aside the conclusion of a referee upon that ground.

As respects the nature of the original agreement, the defendant Young was met by his deliberate statement in writing that the shares were carried for the account of Woodward Young and White, and that Woodward and White had, with his consent, assumed the management of the *joint interests of the three.* He undertook upon his examination to avoid the effect of this written acknowledgment of the joint liability by declaring that he signed it at Heath's request, who told him that he, Heath, had been advised by his counsel that if, during the operation, they should get rid of all the stock, and it should afterwards advance, that Young might come and claim his portion of it, which I do not see that Heath controverted. The referee however held Young to his written statement; from which we must infer that he was not satisfied with the explanation by which Young sought to avoid the effect of it, and we cannot say that the referee erred in so doing.

As respects Woodward, it is impossible to read his testimony, especially his cross-examination, and hold that the referee ought to have given more weight to his evidence than he did. This being the position of the two witnesses who made the agreement with Heath & Co., the case was narrowed down to the conflict between White and Heath, in respect to the admission alleged to have been afterwards made by Heath, and to some other evidence, which will be referred to, upon that point.

A deliberate admission of the terms of a verbal agreement by a party to it, is very satisfactory evidence, where there is no doubt of the fact of the admission. But where the making of the admission is denied—where the party averred to have made it swears distinctly and positively that he never made it—

the testimony relied upon to establish the admission ought to be of a very satisfactory kind, and in some degree supported by other circumstances, as it is a species of evidence that admits only of assertion and denial on the part of those who were present when the admission was alleged to have been made. It has been called a dangerous kind of evidence, from the facility with which it can be fabricated, and weak evidence under any circumstances when it is controverted; because it rests wholly upon a witness's recollection of what was said, who may not reproduce the exact language used, and who may have misinterpreted or misunderstood what the other meant.

The referee having reason, upon the grounds already stated, to doubt the credibility of Woodward and Young, he had the right to attach no weight to their testimony upon this point, and having before him the positive statement of White, that such an admission was made, and the equally positive denial of Heath, that it was not made, the referee had to believe one or the other. White testified that in a conversation at Marvin's, Woodward said to Heath, "I had a distinct understanding with you, that you should look to Young for his share," and that Heath said that was so when the account was opened, but it had not been renewed after White came into the concern. Heath's attention, upon his re-examination, was specifically called to this testimony, and he swore expressly that this alleged conversation never occurred. It is not a statement of a want of recollection, but an unqualified denial, so that one of these two parties must have sworn to what was untrue.

Marvin, in whose presence White testified this alleged admission was made, was examined, and when first interrogated, had no recollection of any such conversation. A written memorandum in the witness's handwriting, of what was said at this interview, was then put into his hand, and he testified that whatever was stated in the memorandum was said. After he had read the paper, he was asked to look at the part relating to Heath's admission, and after having done so, to state whether, thus refreshed, he could then recollect that what was there written was stated at the time, and his answer was "No, I don't remember;" after which the further question was put,

" Well, it must have been said at the time, or you would not have written it down there ? " and he answered " Yes." If this paper had been written by the witness on the 16th, the day when the interview occurred, it would have been entitled to great weight, but it was written nearly two weeks afterwards, and some days after the selling out of the stock, and after Young had become insolvent, and was written at the request of White. It was a memorandum in three distinct parts, each part being subscribed by the witness. The portion containing the alleged admission was added after the first (which was a long statement), had been subscribed by the witness. All that this second part contained was this admission. Marvin first said, that he remembered writing the first part, and said it was all that he remembered at the time when he signed it. He was asked if he remembered writing the second and third parts, which were upon another page, and he answered that he did not remember the circumstances ; that all that he knew was that he saw that they were in his handwriting, and that that was all that he remembered, and finally he said that he did not remember writing any portion of the memorandum ; that the whole thing of the writing of the paper produced had passed entirely out of his memory. · After which he was asked, " You have no memory of writing that paper ? " and he replied, " I have now, but I had not before I saw the paper." All that there was therefore in the evidence was, that when the paper was produced, he remembered the general fact of writing it, which was apparent, as it was in the witness's handwriting. It derived no support from the witness's recollection. He could not say whether the three parts were written at the same time or not. The most material part, the account of the alleged admission of Heath, is in the form of an addendum to the main memorandum, and neither the language, nor the nature of the admission is the same as the admission testified to by White. It is that Woodward said to Heath, " You will remember that in your office I said, Mr. Heath, in this account, each party is only responsible for his share of the account, viz, *one third*, and that you so understood it at the time ; that Heath assented to this, and said, yes, it was so." This is not the admission

sworn to by White, and by Woodward. In White's testimony it is this: "Woodward says to him (Heath), Well, but Heath, we agreed with you. I had a distinct understanding with you, that you should look to Young, and I had no means of knowing what Young was doing, or how much he was worth, or anything about it, and the distinct understanding was that you should look to him," and that Heath replied that that was so when *the account was opened*, but it had not been *renewed* after White came into the concern; upon which White said, that he had done no harm by coming in; that by doing so, he had simply enabled Woodward to take one third, instead of one half. Here the reference by Woodward is to the original understanding in respect to the liability of Woodward and Young to Heath & Co., and contains no such statement as that in the written memorandum of Marvin, that Woodward said, You will remember, Mr. Heath, that I said in your office, each party is only responsible for his share of the account, *one third*"—the admission in the writing referring to a one-third liability of Young, Woodward and White respectively, and the admission sworn to by White, referring to the nature of the liability of Young and Woodward when the agreement was made, before White, in the language of the witness, "came into the concern;" and yet both profess to relate to the same conversation on the 16th of July, and to the same admission. Woodward's testimony is even more explicit. He says, what was talked over on that occasion was the agreement *originally* made as to the non-responsibility for the other shares, which he says that Heath, on the occasion, did not dispute, but acknowledged. There is not only this material discrepancy in the written and the oral account of the same alleged admission; but there is the circumstance that this written memorandum, by its date, was made by Marvin at the request of White, after the speculation had proved disastrous, and after Young had become insolvent, and when it was of most material importance to White whether he was jointly liable to Heath & Co. for the whole loss, or only for one third of it. It professed, moreover, to be a written record by the witness of a conversation he had heard twelve days before he wrote it down, and of which he had no recollection whatever

when he was examined, being oblivious of nearly everything, except that the paper was in his handwriting. The referee considered this written statement of Marvin very carefully. As a paper prepared *post litem motam*, he treated it as a statement to be subjected to severe scrutiny, without necessarily involving any imputation of intentional falsehood on the part of Marvin. He took into consideration Marvin's intimacy with Woodward and White; that he would necessarily become acquainted with their view of the case; that the turning point in the controversy was whether they were liable in *solido*, and may have been unconsciously influenced by these circumstances.

The appellants insist that there was no evidence of any such intimacy, and no foundation for inferring that Marvin, when he wrote the statement, was acquainted with White and Woodward's view of the case, which is simply preposterous. The very putting down the matter in writing at White's request, after the speculation had proved disastrous and the dispute arose, was of itself enough to warrant such an inference. The very fact of getting such a paper signed was enough. The referee attached weight to the fact that no explanation had been given of what he called " the patent inconsistency " between the written and the oral account of the admission, and that the paper was not written until twelve days after the conversation it professed to record. In view of these considerations, he thought that this written statement was not of any value in sustaining the position of the defendants, and he came to the conclusion that the statement of Heath, explained by the circumstances, justified the inference that he never made the admission alleged; whilst, at the same time, his language may have been of so indefinite a character as to have led White, in the ardor of establishing a fact of such vital importance to himself, to suppose that the admission was as broad and unqualified as he then thought it to be. This was a charitable attempt to reconcile both statements, which, perhaps, the case scarcely admits of, as there was a detailed statement of a certain conversation sworn to by White, and an explicit denial on the part of Heath that any such conversation ever occurred. The conclusion arrived at shows that the referee must have believed the

one and not the other. What can an appellate court do in such a case? They cannot say that the referee was wrong. My own impression is, from reading the evidence, that either White or Heath testified upon this point to what was untrue. If they did, who is to decide between them? It must necessarily be the referee, who had the opportunity of seeing and hearing each of them give their testimony.

The referee was certainly justified in attaching no weight to the corroborating testimony on this point of Woodward. The answers of this witness to a number of questions, upon his cross-examination, relating to his own acts in these transactions, exhibited a want of memory which was in remarkable contrast to his precise and accurate recollection of matters asked upon the direct, which went to establish his own and the other defendant's defense. He seemed to remember all that bore in his own favor with sufficient particularity; but his memory was vague and unsatisfactory in respect to nearly everything else. His answers from fols. 1040 to 1045 may be cited as an illustration of this peculiarity in his evidence; whilst his refusal to answer the number of questions put to him in respect to acts, which, if true, seriously damaged his moral character, placed him in a position that entitled him to very little consideration where his evidence was in conflict with that of others. There is nothing, in my experience, that a witness is more prompt to reply to, answer, and explain, where he is entirely able to do so, than questions relating to acts affecting his moral character; and where a witness meets every such inquiry with the response, "I decline to answer," he cannot expect tribunals to give any moral weight to what he says, where he is contradicted by other witnesses to whom no such tests as to their integrity and truthfulness have been applied. Assuming, as we must for the reasons given, that the referee had the right to discredit both the evidence of Woodward and the written statement of Marvin upon this point, the question is reduced to the direct conflict between White and Heath, in which the referee must be regarded as discrediting the statement of the one, and believing that of the other. He found the fact that no such admission was made;

and upon what ground can we say that that finding was erroneous?

One of the grounds upon which we are asked to set aside the report is, that the referee, 1, assumed the existence of evidence that had not been given; and, 2, overlooked and excluded from his consideration important evidence of the defendants. Judge DALY has fully considered this objection, and shown by reference to the testimony, that the appellants are mistaken in respect to many particulars upon which they relied, and as respects matters upon which they were correct, that they were not of the slightest importance. I have read the evidence from beginning to end, and have gone over the referee's long opinion, in connection with the minute and and elaborate commentary upon it, made by the appellants, and considering the voluminous nature of the testimony, I think, upon the whole, that it was fairly and comprehensively considered. It is complained that the referee has not taken into account any of the acts of Heath & Co. from the 15th to the 19th of July, in dividing the stock into thirds, and delivering to each his several third, and that he refused to find this fact. Assuming that he should have so found, such a delivery to each of his proportional part, as between themselves, may have been entirely consistent with their collective liability to Heath & Co., as their brokers. It did not necessarily tend to prove that Heath's statement of the original agreement was untrue. It does not follow, that because the referee does not refer to it in his opinion, that he overlooked it. He probably attached no weight to it; and are we to say that he should have done so, and from that circumstance have believed White, Woodward, and Young, and disbelieved Heath and Quincey? Again, it is certainly true that some of the statements made by Heath do not seem to agree with others; and the referee himself seems to have regarded some things established which Heath denied. But it is not in this way that a finding upon a general question of fact is to be tested upon conflicting evidence. It is the conclusion which the mind forms in respect to the facts in controversy that is to govern, and it must be plain and obvious, upon the whole evidence, that the finding was wrong, to justify setting it aside. It may be, upon a re-

view of the whole evidence, that the reasons given, or the deductions drawn from particular facts, may be wrong, and yet that the general conclusion was right. Indeed, in judicial experience, such instances do occur, and it is a more familiar experience that courts of review often put their affirmance of a judgment upon a different ground than that which was relied upon by the court that gave the judgment. It is upon the referee's opinion chiefly that the appellants urge us to reverse his decision, whereas we can look only at the whole evidence, and the general conclusion that he came to upon it. And where the case turns, as this does, upon a direct conflict between the parties in interest—Woodward, White, and Young swearing that there was a special agreement; and Heath and Quincey that there was not; that the agreement was that which the law creates from the nature of the transaction, where three parties combine to speculate in stocks, and another party acts as their broker in the speculation—we must hold that the question of relative credibility is not for us, and that the referee has necessarily settled, by the conclusion he arrived at upon the whole evidence, that he believed, in respect to the matter which was in conflict, the statement of Heath and Quincey, and did not believe that of Woodward, Young, and White. The strength of this case lies in the circumstance that the law would imply, from the nature of the transaction, a joint liability, unless a special agreement was made to the contrary. The burden was consequently upon the defendants to establish that the liability was limited, and not general. This they undertook to do, but failed to convince the referee that there was a contract of this exceptional description; and there is no view that we could present of this evidence from which we could reason, legally and logically, that he was undoubtedly wrong in coming to that conclusion. I, therefore, agree that the judgment must be affirmed.

LOEW, J.—I have carefully perused the evidence in this case, and agree with my brethren that, for the reasons stated in the opinions delivered by them, the judgment should be affirmed.

Judgment affirmed.