(153 App. Div. 865.)

POST et al. v. THOMAS et al.

(Supreme Court, Appellate Division, First Department. December 13, 1912.)

1. BROKERS (§ 9*)—STOCKBROKERS—POWERS.
    Where an agent for subscribers to a stock pool account has authority to manage the pool and close it out when he sees fit, his agency is terminated when he causes a transfer of the account to another account of which he has also control.
    [Ed. Note.—For other cases, see Brokers, Cent. Dig. § 10; Dec. Dig. § 9.*]

2. PRINCIPAL AND AGENT (§§ 69, 164*)—SALE BY AGENT TO HIMSELF—VALIDITY.
    An agent may not sell to himself without his principal's consent; but the latter, on discovering the facts, may adopt and acquiesce in the act.
    [Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 130–145, 622–625; Dec. Dig. §§ 69, 164.*]

3. BROKERS (§ 9*)—TRANSACTIONS—CLOSING OUT—ACTS CONSTITUTING.
    A stock brokerage firm carried a stock pool account for defendants T., H., and O., who were speculating in a certain stock. T. purchased the interest of O. in the account, and notified the brokers thereof, stating that

his interest was a two-thirds interest, while H. owned a one-third interest, and that the account was not a joint one, but did not notify the firm that H. knew of his acquisition of O.'s interest. There was no real market for the stock, and the account was on T.'s order transferred to the account of a syndicate of which he was manager. Subsequently the account, pursuant to T.'s order, was retransferred to the original account. *Held,* that the transfer of the account was as to H., ignorant of the transaction, a closing out of the pool account.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 10; Dec. Dig. § 9.*]

**4. Brokers (§ 74*)—Release (§ 12*)—Consideration.**

A stock brokerage firm carried for T., H., and O. a stock pool account. T. purchased the interest of O. in the account and notified the firm thereof, stating that his interest and the interest of H. were not joint, but did not notify them that H. knew of the purchase. Pursuant to T.'s direction, the firm transferred the account to the account of a syndicate of which he was manager. Subsequently, pursuant to T.'s directions, and without H.'s knowledge, the account was retransferred to the original account. Thereafter T. was released from liability on the theory that H. was liable, though the transfer operated to close out the original account as to him. *Held* that, since T. was the only person liable on the account when the release was executed, the release was without consideration, and the firm, not being bound to know that T. was the sole debtor, could sue him for the balance due on the original account.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 62; Dec. Dig. § 74;* Release, Cent. Dig. §§ 12–20; Dec. Dig. § 12.*]

Ingraham, P. J., and Laughlin, J., dissenting.

Appeal from Order Entered on Report of Referee.

Action by Edwin M. Post and another against Edward R. Thomas and others. From a judgment for plaintiffs, entered on the report of a referee, defendant Thomas appeals. Affirmed.

See, also, 144 App. Div. 897, 129 N. Y. Supp. 1143.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

Edward L. Blackman, of New York City, for appellant.

William G. Wilson, for plaintiffs-respondents Post and Warner.

Origen S. Seymour, of New York City (Nathaniel R. Bronson, of Waterbury, Conn., and Henry M. Kidder, of Fremont, Neb., on the brief), for respondent Hamilton.

SCOTT, J. [1] In my opinion the judgment should be affirmed. It makes little matter, as it seems to me, whether the members of the pool are to be regarded as partners, or as joint adventurers. Whatever their relations were to each other, the defendant Thomas acted as agent for the subscribers to the pool, and I think that we may assume for the purpose of this appeal that he was authorized so to act, and that it was confided to his discretion to manage it, and, when he saw fit, to close it out. I think that he did close it out when he caused the account to be transferred to his own account, or, what is the same thing, to the Silver Syndicate account. That ended his agency so far as Hamilton was concerned, and there is nothing to show that he ever received authority from Hamilton to re-embark in the speculation.

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

[2, 3] Of course, as Hamilton's agent, he could not sell to himself without Hamilton's consent; but the latter, when he had discovered that his agent had undertaken to sell out to himself, was entitled to adopt and acquiesce in his act. It will not do, as it seems to me, to say that the transfer of the account to the Silver Syndicate account, and its retransfer a week afterwards, was a mere bookkeeping transaction. It is true that the transaction was effected by entries on the books of Post and Thomas; but so far as Hamilton was concerned it was a closing out of the pool account.

[4] If I am right in this, Thomas was the sole person liable on the "K. & K. Syndicate account" when the paper relied upon as a release was executed, and if he was so liable that release was without consideration. Plaintiff was not bound to know then that Thomas was the sole debtor. He may well have believed, from Thomas' statements and actions, that Hamilton had consented to the transfer and retransfer of the "K. & K. Syndicate account" and remained jointly or partly liable therefor. Indeed, it is probable that he did so believe; for he testified that a part of the consideration upon which the release was given was the promise that he should be furnished with evidence that Hamilton was liable for one-third of the balance remaining unpaid upon the account.

The judgment should be affirmed, with costs.

CLARKE and MILLER, JJ., concur.

LAUGHLIN, J. (dissenting). The plaintiffs were the general partners of the stock brokerage firm of Post & Co., and they brought this action to recover the balance of a pool account which said firm carried for the defendants, who were buying and selling the capital stock of the Keokuk & Des Moines Railroad Company, upon the theory that the defendants are jointly liable therefor. The complaint was dismissed as to the defendants Orlando F. Thomas and Hamilton upon the theory that they were discharged from liability by a transaction between the plaintiffs' firm and Edward R. Thomas, by which the pool account was transferred to another account carried by said firm, which he owned or managed. The plaintiffs have not appealed. The only object of the appellant, in appealing from the judgment in so far as it dismisses the complaint as against Hamilton, was to protect his right to contribution against Hamilton in the event that there should be a new trial.

The pool was originally formed by the defendants and one Carlton, and the account was originally opened in September, 1901, with the stock brokerage firm of Thomas & Post, composed of the plaintiff Edwin M. Post, and the defendants Edward R. and Orlando F. Thomas. The referee found that by mutual consent Carlton severed his connection with the pool about a week or ten days after the time it started, and that finding has been acquiesced in, and therefore it is not necessary to consider whether it is supported by the evidence. In September, 1902, the firm of Thomas & Post was dissolved, and two new firms were formed, one the firm of Thomas & Thomas, composed of the defendants Edward R. and Orlando F. Thomas and one

Beekman, and the other the firm of Post & Co., composed of the plaintiffs as general partners and two others as special partners. At that time this pool account was transferred to the firm of Thomas & Thomas, and was carried by it until April 1, 1903, when that firm was dissolved, and this and all other accounts and business were transferred to Post & Co.

At the start, the plaintiff Post was invited to become a member of the pool; but he declined, and he took part in an interview by which the agreement for the formation of the pool, which rested in parol, was made. According to his testimony, each of the members of the pool was to contribute one-third of the amount required to margin the account—he apparently did not know that Carlton was to become a member of the pool at that time—and an amount was to be thus contributed which he then deemed sufficient to carry the speculation to a successful conclusion. Each of the four members of the pool had individual accounts with Thomas & Post, and each of these accounts was charged with $5,000, and the same amount was credited to the pool account, which was opened in the name of "K. & K. Syndicate." Thereafter each of the three remaining members of the pool contributed an additional $5,000, and shortly before the pool account was taken over by the plaintiffs' firm. The firm of Thomas & Thomas, which then held it, wrote the plaintiffs' firm on March 25, 1903, as follows:

"In transferring accounts to you from Thomas & Thomas, all accounts are to stand on their own merits; that is, a statement of the exact condition of each account is to be rendered, showing the exact amount of money necessary to take up the account and the securities therein. The K. & K. pool is to be kept intact; orders being given to Mr. O. F. Thomas, or Mr. E. R. Thomas. However, Mr. E. R. Thomas is to deposit $25,000 on his part, and Mr. O. F. Thomas $25,000 in cash, and suitable arrangement will be made with Mr. Hamilton for a protection of his one-third interest."

Thereafter, and before the transfer of the account to plaintiffs' firm, each of the Thomases contributed $25,000, and shortly after the transfer of the account the plaintiffs' firm wrote to Hamilton, asking him to contribute $25,000 as margins to strengthen his interest in the syndicate. He neither answered this letter, nor complied with the request, and he has made no further contribution to the pool account.

Concerning the original agreement, Hamilton testified that the contributions which he made were on the distinct understanding that that was the extent of his liability, and the Thomases both testified in substance that there was to be no joint liability, and each member of the pool was to be liable merely for his proportionate share. The plaintiff Post testified that there was no express agreement so far as he knew with respect to whether the members of the pool were to be jointly and severally liable, or only severally liable; but it clearly appears that he understood that as between themselves they were to contribute in equal shares. It further appears, by his testimony and his attitude toward the various transactions, that he and his firm considered that any member of the pool could terminate his liability by transferring his interest, and that the several members were liable to his firm, for contributions to maintain the necessary margin, in equal proportions.

On or about the 13th day of April, 1903, the appellant purchased the interest of Orlando F. Thomas in the pool account, and wrote the plaintiffs' firm relating to other matters, and with reference to this account, as follows:

"I also wish to inform you that I have purchased from Mr. O. F. Thomas his one-third interest in the account on your books known as the 'Keokuk & Des Moines Pool,' and that I hereby assume all his liability and credit in the same. I wish it clearly understood that my present interest in this pool is a two-thirds interest, and that I am responsible for two-thirds of its losses, and am entitled to two-thirds of its profits after I am credited with the $50,-000 margin which I now have on my two-thirds share in excess of Mr. Hamilton's proportionate margin, the other one-third being owned by Mr. C. A. Hamilton, and that this account is in no sense a joint account. In other words, myself and Mr. Hamilton are each liable for our share, and not for the share of the other. Will you kindly confirm the receipt of this letter."

On the same day Orlando F. Thomas wrote the plaintiffs' firm, stating, among other things, as follows:

"Furthermore, that I have sold to Mr. E. R. Thomas my one-third interest in the 'Keokuk & Des Moines Syndicate,' including whatever margin I may have against it, and no further liability attaches to me."

The plaintiffs' firm, on the receipt of these letters, wrote the appellant under date of April 14, 1903, as follows:

"Concerning the 'Keokuk & Des Moines Syndicate,' we now understand that you are sole owner and liable for two-thirds of the same, and that Mr. O. F. Thomas has no further interest in said syndicate, the remaining one-third being the property of C. A. Hamilton."

And they also wrote Orlando F. Thomas on the same day as follows:

"As we understand it, * * * that you have disposed of, to Mr. E. R. Thomas, your one-third interest in the 'Keokuk & Des Moines Syndicate,' including all margin thereon."

This correspondence further shows that Orlando F. Thomas at the same time purchased the appellant's interest in two other accounts carried for them by the plaintiffs' firm, and assumed all liability with respect thereto, and that the appellant was discharged from liability thereon.

At the time the pool account was transferred to the plaintiffs' firm, it showed a debit balance of $169,994.65, consisting of advances made for the purchase of the stock over and above the amounts received, together with interest thereon and commissions, and as security therefor the plaintiffs' firm received 5,450 shares of the capital stock of the Keokuk & Des Moines Railroad Company. The market value of the stock at that time was not definitely shown; but it appears that 13 days later, when the plaintiffs' firm was notified that Edward R. Thomas had purchased the interest of Orlando F. Thomas, and when the debit balance in favor of the firm was $170,244.66, for which it held the same number of shares of the stock as security, the referee found, and the finding has not been questioned, that its market value was in excess of $200,000. It thus appears that at the time the plaintiffs' firm received the letters notifying it that Orlando F.

Thomas' interest had been acquired by Edward R. Thomas, and that the liability of the latter was several, and only for two-thirds, the firm held securities upon which about $30,000 in excess of the amount owing to it could have been realized, if the account had then been closed out. It will be observed that neither of the letters, notifying the plaintiffs' firm of the transfer of the interest of Orlando F. Thomas to Edward R. Thomas, contained any representation that such transfer was made with the knowledge or consent of Hamilton; and it appears by the testimony of the plaintiff Post that he did not communicate with Hamilton on the subject, or deem it necessary to communicate with him with reference to such transfer, for he apparently recognized that any member of the pool was at liberty to transfer his interest. If there was no special agreement by the members of the pool by which they were not to be jointly liable, doubtless they became partners. See Quincey v. Young, 5 Daly, 327, affirmed, sub nomine Quincey v. White, 63 N. Y. 370; Orvis v. Curtiss, 157 N. Y. 657, 52 N. E. 690, 68 Am. St. Rep. 810; Franklin v. Hoadley, 115 App. Div. 538, 101 N. Y. Supp. 374; Id., 126 App. Div. 687, 111 N. Y. Supp. 300; Id., 145 App. Div. 228, 130 N. Y. Supp. 47.

Evidence was received upon the trial from which it is claimed that there was a well-recognized custom by which members of a pool, without any express agreement, were only liable severally to the extent of their respective interests; but the evidence on that point is conflicting, and I do not deem it necessary for us either to determine the fact or to decide whether such a custom could change the rule of law. If a partnership existed, it would be dissolved by the transfer of the interest of one. See Marquand v. N. Y. Mfg. Co., 17 Johns. 525; Mumford v. McKay, 8 Wend. 442, 24 Am. Dec. 34; Sistare v. Cushing, 4 Hun, 503; Kennedy v. Porter et al., 109 N. Y. 526, 549, 550, 17 N. E. 426. On that theory, if Hamilton did not know of the transfer and acquiesce therein, he would not be further liable as a partner for future dealings on the part of any member of the partnership, excepting in so far as such dealings constituted steps in the liquidation of the business of the partnership; and counsel for the respondents do not contend that any of the transactions other than the transfer to the Silver Syndicate would not fall within that category, although they do not admit it.

But I am of opinion that the evidence shows that Hamilton was informed of such transfer, and by failing to object thereto must be deemed to have acquiesced therein. Moreover, if this were not so, inasmuch as the appellant made no misrepresentation to the plaintiffs' firm with respect to such transfer, the plaintiffs should be deemed estopped as to him from claiming that thereafter his liability was other than several, as stated in his letter, in which they acquiesced. It cannot be successfully maintained that there is no basis for such estoppel, for the account was continued when it might have been closed out by the appellant. After that time the evidence tends to show that there was no active market for the stock, and that the only sales were sales made by the plaintiffs' firm through certain brokers, at a little less than the price at which the stock was offered

in the market at the time by third parties to certain other brokers who were authorized by the plaintiffs' firm to purchase it.

It thus appears, with respect to those sales, that *in form* the plaintiffs' firm received the stock back at the same price for which they sold it, less commissions; but in fact they retained the stock and merely paid the commissions, and the sales were what are known as "wash sales," and were made for the purpose of keeping up an apparent market for the securities. Such wash sales were continued until the 16th day of June, 1903, when by direction of the appellant the plaintiffs' firm transferred the pool account to a so-called "International Silver Syndicate" account, which was owned by the appellant, or in which he was interested, and of which he was the manager. Prior to this transfer to the Silver Syndicate account, and on May 21, 1903, at the request of the plaintiffs' firm, the appellant took up 1,000 shares of the stock by having it transferred to other brokers; the plaintiffs' firm receiving therefor $34,500. Immediately prior to the transfer to the Silver Syndicate account, the plaintiffs' firm was insisting upon further margins, or having the pool account closed, for the reason that it was unable to obtain loans on the stock sufficient to enable it to carry the account. The Silver Syndicate account at that time had a large credit balance. At the time the pool account was so transferred to the Silver Syndicate account, it had a debit balance of $138,140.82. One week after the pool account was thus transferred to the Silver Syndicate account, and on June 23, 1903, the plaintiffs' firm transferred it back on their books to the pool account, by direction of the appellant, with a debit balance of $102,017.52. During that week there were no transactions in the stock by the plaintiffs' firm in either the pool account or in the Silver Syndicate account. It thus appears that the effect of the transfer of the pool account to the Silver Syndicate account, and back to the pool account again, was to give to the pool account a credit of $36,123.30.

Hamilton was not informed of this transfer, and knew nothing about it until long after; but no misrepresentation was made by the appellant to the plaintiffs' firm with respect thereto. The transfer of the pool account to the Silver Syndicate account on the books of the plaintiffs' firm *in form* extinguished the pool account; but the management of that account, or the liquidation of it, on the theory of the existence of a partnership and the dissolution thereof, was wholly left to the appellant, and it cannot fairly be inferred from the evidence that he intended by authorizing such transfer to become the purchaser of the stock himself and to assume individually the entire liability for the account. The appellant could not, without the consent of Hamilton, sell the stock to himself, and it is evident that he did not so intend. There is no element of estoppel shown by such transfer as against him in favor of plaintiffs' firm, and that such transfer inured to the benefit of the pool account is conclusively shown by the fact that, during the week intervening between the transfer and the retransfer thereof to the pool account, there was no market for the stock, and the pool account received a large credit. After the retransfer of the account to the pool account on the books of the plain-

tiffs' firm, there was no active market for the stock, and the only sales were similar wash sales, with the exception that on July 27, 1903, the appellant took up 1,000 shares, for which the plaintiffs' firm received $15,000, and on August 6, 1903, another 1,000 shares, for which it received the same amount. On June 23, 1904, the balance owing to the plaintiffs' firm on account of this pool account was $78,325.06, for which they held 2,450 shares of the stock. In the meantime, the plaintiffs' firm was dissolved, and the plaintiff Post became the liquidator of and attorney in fact for it. On said 23d day of June, 1904, as such liquidator and attorney in fact, the plaintiff Post executed and delivered to the appellant a release not under seal in the form of a letter, as follows:

"For one dollar and other valuable consideration, and by virtue of the powers vested in me as sole liquidator for the firm of Post & Co. and as their attorney in fact, I hereby release and absolve you from any liability on account of what was carried on the books of Post & Co., and known as the 'K. & K. Syndicate Account,' and will execute any further paper which you may require to carry this out."

The plaintiff Post testified that the "other valuable consideration," referred to in the release, consisted of an agreement by the appellant that he would furnish evidence that the amount unpaid by Hamilton for his one-third interest in the pool account, owing to the fact that he had not contributed his proportionate share, equaled or exceeded the balance then owing to Post & Co. on account of the pool account. According to the testimony of Post there was no representation on the part of the appellant with respect to the *legal* liability of Hamilton as a partner, or otherwise; and the only theory upon which he required an agreement on the part of the appellant to furnish such evidence was that there might have been transactions between the appellant and Hamilton, relating to their respective contributions, of which he was not aware.

It is contended in behalf of plaintiffs that the appellant did not furnish such evidence, and therefore there was a failure of consideration. That contention is answered by the fact that there is no evidence that appellant was requested to furnish the evidence or refused to do so. The testimony of Post with respect to the circumstances attending the execution of the release is controverted by the appellant, who testified, in substance, that Post was desirous of having him take up his interest in the pool account, and that they had two or three conversations on the subject, the substance of which was that he offered to pay for *his interest* in cash, or to take up the remaining stock for an agreed price, upon condition that he should be given a release of liability, and that Post preferred that he take the stock on account of the fact that there were no transactions in it and money could not be borrowed on it, and, after some negotiations concerning the price at which he should take the stock, $30,000 was agreed upon, and the release was executed and delivered, and that on July 1st thereafter he paid the $30,000 and received the stock. This payment reduced the balance of the indebtedness owing to Post & Co. on account of the pool account to $48,325.06, for which this action was brought.

It evidently was contended by the plaintiffs upon the trial, and is contended on the appeal, that there was no consideration for the release, and that, therefore, it did not discharge the appellant. The theory upon which this contention is argued out in the brief is that the appellant, in paying the $30,000 and taking up the remaining shares of the stock, paid nothing on account of the indebtedness to the plaintiffs' firm, and that the transaction was merely a purchase of the stock by the appellant, and the entire consideration, was for the stock. The theory upon which the referee held the appellant liable for the entire balance, as shown by his opinion, is that, by having the pool account transferred to the Silver Syndicate account, the appellant became individually liable for the entire account, and that, therefore, there was no consideration for the release of his liability on payment of part only of the balance owing, there being no dispute with reference to the amount thereof. It is quite clear, I think, that, at least as between the plaintiffs' firm and the appellant, the transfer of the pool account to the Silver Syndicate account did not increase the appellant's liability. That was a transfer in form only, and the fact that the plaintiffs' firm interposed no objection to transferring the account back to the pool account is cogent evidence that they did not understand that appellant had become liable to them for the entire pool account.

According to the testimony of Post, he intended, when he executed the release, to release the appellant from further liability. He did not claim at that time that the appellant was liable for more than his proportionate interest in the pool account, and, so far as the record shows, he never made such a claim until this action was brought. On that theory, which the uncontroverted evidence shows was asserted by the appellant at the time he took over the interest of Orlando F. Thomas and assumed liability therefor, and had been at all times acquiesced in by the plaintiffs' firm, the appellant was under no obligation to purchase, or take over, the entire remaining stock standing to the credit of the pool account, and in no view was the appellant liable to the plaintiffs' firm for the amount which he paid, excepting upon the theory of his assumption of the liability of Orlando F. Thomas. It is immaterial, to the decision of this appeal, how the question of fact is determined as to whether there was a special agreement with the brokers at the outset, by which the members of the pool were to become severally liable only, each for his proportionate share. It may be assumed that they were originally liable to the brokers as partners. There has been no misrepresentation with respect to the facts, and the most that can be claimed in behalf of the plaintiffs is that they labored throughout under a misapprehension as to the law, and that they supposed that the members of the pool were severally liable only, whereas they are now advised and contend that they were jointly liable.

If the members of the pool were severally liable only, then nothing has occurred, in my opinion, to change that into a joint liability, or to render the appellant liable for the entire account, and he was discharged by the release for he was then willing to pay his several

liability in cash, and paid it by taking the stock because Post preferred that course. If, on the other hand, they were liable as partners, then the plaintiffs are chargeable with knowledge of the law, and they are presumed to have known that the appellant was desirous of changing that liability when he bought out the interest of Orlando F. Thomas and assumed an *individual two-thirds liability,* which was a *different liability* from his liability as a partner, because he could be sued thereon, and a recovery could be had and enforced against him individually on the two-thirds liability; whereas, on the theory of a partnership, he could be sued only on his liability as a partner, and any judgment recovered would have to be satisfied in the first instance out of the partnership property, and his individual property would be liable therefor only after the payment of his individual debts. Upon this difference between an individual liability and a partnership liability, it was held in Ludington v. Bell, 77 N. Y. 138, 33 Am. Rep. 601, that the giving of a note by one member of a copartnership individually, after its dissolution, for part of a copartnership debt, constituted a good consideration for an agreement on the part of the creditor to release and discharge him from further liability. The assumption of a several *individual two-thirds liability* for partnership obligations afforded a good consideration for the release of the joint liability as a partner which theretofore existed. Matherson v. Belden, 14 App. Div. 519, 43 N. Y. Supp. 888; Bendix v. Ayres, 21 App. Div. 570, 48 N. Y. Supp. 211. The acceptance of this new liability and the acquiescence therein by the continuance of the account constituted a new agreement, and afforded a good consideration, as between the plaintiffs' firm and the appellant, for changing his liability into a several liability to the extent of two-thirds of the pool account. Matherson and Bendix Cases, supra, and Jaffray et al. v. Davis et al., 124 N. Y. 164, 26 N. E. 351, 11 L. R. A. 710.

This theory with respect to the change of liability is not affected by the fact that at that time the stock held by the plaintiffs' firm was ample security for the indebtedness owing to them, for the manifest purpose of the communications by the appellant and by Orlando F. Thomas to the plaintiffs' firm, and by it in accepting the same, was to have it distinctly understood that if the account was to be continued the appellant's liability was to be limited to two-thirds of the amount owing at any time on account of his two-thirds interest. On the theory that the appellant was liable for only two-thirds, his liability at the time the release was executed was about $23,500; for the total amount contributed to the pool down to that time was $116,-123.30, and the balance owing to the plaintiffs' firm was $78,325.06, making a total of $194,448.36, one-third of which is $64,816.12, and Hamilton had contributed only $10,000 on account of his one-third interest, leaving a balance owing on account of that interest of $54,-816.12, which, deducted from the balance owing at the time the release was executed, leaves $23,508.94; and on payment of that amount the appellant, on that theory, would have been entitled to receive two-thirds of the stock then carried by the plaintiffs' firm. The learned counsel for the respondents, in stating the amount of the

appellant's liability at this time, on the theory of a several liability, apparently overlooked the fact that the plaintiffs were expressly notified, by the appellant's letter informing them that he had purchased the interest of Orlando F. Thomas, that his interest and liability for the future was two-thirds interest in profits and two-thirds liability for losses, after crediting him with the $50,000 contributed as margins in excess of the margin contributed by Hamilton. Instead of paying his two-thirds liability in cash, the appellant, at the request of the plantiffs' firm, took over the entire balance of the stock in its hands and paid $30,000.

The plaintiffs contend, as already stated, that this was not a payment on account, but that it was the purchase of the stock the same as a third party might have purchased it; but, even on that theory, two-thirds of the $30,000 should be credited to the appellant's liability, which would reduce it to about $3,500, and no argument is presented in favor of holding him liable for that balance on the theory that his purchase of the stock merely constituted a payment of $20,-000 on account of his liability, leaving such balance unpaid. The evidence, however, does not show that the appellant purchased this stock as an outsider, as he would buy stock for speculation or investment; but, on the contrary, it quite clearly appears that he considered that the basis upon which he purchased it was allowing a very liberal valuation for stock, which then had no real market value, and that his only purpose in so doing was to obtain a release of any further liability on account of the pool account transactions. Moreover, according to the testimony of the appellant, which is not controverted, he left it optional with Post whether he should pay the balance on account of his two-thirds liability in cash, or take over the stock, and therefore it cannot be contended that his taking the stock was not equivalent to paying the balance of his liability on the theory of a two-thirds liability. On the assumption that there was a partnership liability on the part of the appellant at the time the release was executed, it would seem that the payment by him of the $30,000 for the stock out of his individual funds, as a condition of obtaining a release, would afford a sufficient consideration to sustain the release, for the plaintiffs knew that there were no copartnership funds from which the payment could have been made.

If the creation of an individual liability, by giving a note for *part* of a copartnership debt, affords a good consideration for a release of liability as a partner, it follows on principle, I think, that a payment of *part·* of a copartnership debt in cash from *individual funds* constitutes a good consideration for releasing the former liability as a copartner. See Bendix v. Ayres, supra. There can be no distinction between giving an *unsecured* note and paying the amount, for which the note would be given, in cash. This proposition is sustained by the authorities holding that neither payment of part of an *individual* obligation in cash, nor promising to pay the same amount in the future by an *unsecured* negotiable promissory note, constitutes a good consideration for the release of the entire debt. See Bendix v. Ayres, supra; Shanley v. Koehler, 80 App. Div. 566, 80 N. Y.

Supp. 679, affirmed 178 N. Y. 556, 70 N. E. 1109; Jaffray et al. v. Davis et al., supra. The purchase, or taking over, of the stock by the appellant paying therefor, or on the account, his *individual funds,* was something more than plaintiffs were entitled to on the theory of a copartnership liability at that time, and constituted a new agreement, which afforded a consideration for an accord and satisfaction. Allison v. Abendroth, 108 N. Y. 470, 15 N. E. 606.

These views differ with the determination of the referee on the facts in some respects, and require the reversal of the findings numbered 13 and 18, in so far as it is therein found that Hamilton was not aware of the transfer of the interest of Orlando F. Thomas to Edward R. Thomas, and findings numbered 19 and 20, in so far as it is therein found that the pool was dissolved by the transfer of the interest of Orlando F. Thomas to Edward R. Thomas, and finding numbered 24, in so far as it is therein found that the International Silver Syndicate assumed the indebtedness in the pool account, and that said International Silver Syndicate was accepted as debtor in place and stead of the pool, by the transfer thereof in form to it on the books of the plaintiffs' firm, and finding numbered 29, in so far as it is therein found that the release to the appellant was executed without consideration, and require a reversal of the judgment as against the appellant, and the dismissal of the complaint against him. See Bonnette v. Molloy, 138 N. Y. Supp. 67.

It follows that the judgment in favor of the plaintiffs against the appellant should be reversed, with costs, and the complaint dismissed, with costs.

INGRAHAM, P. J., concurs.