HARVEY KENNEDY, Appellant and Respondent, *v.* HENRY H. PORTER et al., Appellants and Respondents

Whenever a requested finding of fact is based upon uncontradicted evidence, or is a legitimate and necessary deduction from facts proved or found, a refusal by the trial court to make such a finding is error in law, and is reviewable in this court.

Certain persons, who were directors and stockholders of the C. & N. W. R. Co., with the design of getting control of the W. W. R. R. Co. that it might be operated for the benefit of the former company, entered into a partnership agreement for "the purchase and sale and general dealing" in the stock of said W. W. R. R. Co., which, by its terms, was to continue "until the same shall be dissolved by the written agreement of persons representing a majority in amount of the sums" subscribed by the copartners, respectively. It was provided that the business should be exclusively managed by P., one of the copartners, who was required to keep accounts of all his transactions in the business, and in case of the death of any member, that his interest should not cease, but should continue under the direction of his legal representatives. The capital stock referred to, which consisted of 50,000 shares, 10,000 preferred, 40,000 common, had all been transferred by the company to B. to pay for building and equipping its road. The amount subscribed and paid in as the capital of the copartnership was $100,000. With this sum P. purchased of B. all the preferred stock and 36,850 shares of the common. P. subsequently, for the purpose of enabling the W. W. R. R. Co. to raise funds to meet its floating indebtedness, surrendered to it the 10,000 shares preferred stock, which act was ratified and approved by his copartners, and thereafter the firm, through a committee selected by the

members, sold to the C. & N. W. R. Co. one-half of the stock owned by it for $100,000, which was distributed among the several members of the firm or their assignees, in proportion to their interests, respectively, and P. thereupon caused the remaining stock to be divided among them in the same proportion. This distribution embraced all the property of the copartnership. Subsequently P. purchased on his own account and received a transfer of the stock which had been transferred to the C. & N. W. R. Co. *Held,* that an action was not maintainable by one of the copartners to compel P. to account for and pay over any profits growing out of such purchase; that by the return of the original capital of the firm to its several members and the final distribution of its assets, the partnership ceased to exist; its members had no power thereafter to contract new obligations on its account or enter into new speculations by virtue of the original contract; and that, therefore, as P. did not assume to act for the firm in making the purchase, he was not bound to account to his former copartners.

Subsequent to the sale by the firm and distribution of its assets the property of the W. W. R. R. Co. was sold on foreclosure and a new company organized under a plan which contemplated the execution of a new mortgage to replace the one foreclosed, and the division of the stock of the new company, in certain proportions, among the stockholders of the old company. This plan was carried out and P. received preferred stock of the new company for that which had been surrendered. This he distributed among the several copartners according to their *pro rata* interests. *Held,* that this did not conclude him from denying the existence of the partnership at that time, at it was not inconsistent with the theory that it had previously been dissolved.

As to whether if the firm had continued to exist P. could lawfully have purchased the stock in question in his own name and for his own benefit, *quære.*

(Argued April 23, 1888; decided June 5, 1888.)

THESE are cross appeals from portions of a judgment of the General Term of the Supreme Court, in the first judicial department, entered upon an order made April 21, 1885, which reversed in part and affirmed in part a judgment entered on a decision of the court on trial at Special Term.

This action was brought to compel an accounting as between copartners.

The material facts are stated in the opinion:

*Edmund Randolph Robinson* for plaintiff. Porter, being manager and trustee of the partnership and president of the

company, could not, by subsequently reissuing the stock, make a mortgage in his own favor and appropriate its benefits to himself and such of the partners as he chose to select, leaving out the plaintiff. The law *ex necessitate* would, from the creation of such an incumbrance, imply a promise on his part to indemnify those who would otherwise be injured, by admitting them to a participation in the benefits. (*Rothwell* v. *Dewas*, 2 Black, 613; *Van Horne* v. *Fonda*, 5 Johns. Ch. 388; *Lloyd* v. *Lynch*, 28 Penn. St. 419; *Downer* v. *Smith*, 38 Vt. 464.) What is called "the surrender" of the preferred stock was, in fact, an empty ceremony without legal operation or efficacy. (*Agricultural Bk.* v. *Burr*, 24 Me. 256; *Wheeler* v. *Allen*, 49 Barb. 460; *S. C.*, 51 N. Y. 37; *Thorp* v. *Wood-hull*, 1 Sandf. Ch. 411; *Rutter* v. *Kilpatrick*, 63 N. Y. 604; *Burrall* v. *R. R. Co.*, 75 id. 211; *Williams* v. *Tel. Co.*, 93 id. 640.) Where there is any evidence to sustain the findings this court will not interfere. It has no jurisdiction to weigh evidence. (*Kane* v. *Cortesy*, 100 N. Y. 132; *Mooney* v. *McLaughlin*, 105 id. 678; Week. Dig. vol. 26, 473; *Prosser* v. *Bank*, 106 N. Y. 677.) The copartnership and the trust relation created by the articles of January, 1875, did not terminate in October, 1876, but continued during and after June, 1878, and until the completion of the distribution of the preferred stock in the autumn of 1879. (*Lewis* v. *Barton*, 106 N. Y. 70; *Prosser* v. *Bank*, Id. 677; 27 Week. Dig. 229; *Mooney* v. *McLaughlin*, 105 N. Y. 678; 26 Week. Dig. 473; *Kane* v. *Cortesy*, 100 N. Y. 132; *Burnap* v. *Bank*, 96 id. 125; *Rider Co.* v. *Roach*, 97 id. 378; *Marco* v. *Insurance Co.*, 35 id. 664.) Language of a contract, neither uncertain nor ambiguous, must be construed according to its apparent import, and the rights of the parties be determined by such language, even if their acts make it probable that they had no such intention. (*Norton* v. *Woodruff*, 2 N. Y. 153; *Couch* v. *Delaplaine*, 2 id. 397, 404; *Giles* v. *Comstock*, 4 id. 270; Whart. on Cont. 174, § 658; 2 Pars. on Cont. [7th ed.] 495, 626; *Gibson* v. *Minet*, 1 H. Bl. 569, 614.) Assuming that the reality of the transaction of June, 1878,

was a sale by the Northwestern Company to Porter for $50 of the stock which the company had acquired from the copartnership in October, 1876, in settlement of what the company was entitled to under the contract of October, 1875, still pending the existence of the copartnership, Porter, its manager and trustee, could not buy for his own advantage, and free from his fiduciary duty, the commodity which the copartnership was organized to trade in. (Lindley on Part. 854; *Platt* v. *Platt*, 2 N. Y. S. C. [T. & C.] 39; *Anderson* v. *Lenon*, 8 N. Y. 236; *Mitchell* v. *Read*, 61 id. 123, 136; *S. C.*, 84 id. 556; *Clegg* v. *Edmunston*, 8 DeG. McN. & G. 787; *Spiess* v. *Rosswog*, 48 N. Y. Super. Ct. R. 135; *Getty* v. *Devlin*, 54 N. Y. 412; *Gardner* v. *McCutcheon*, 4 Beav. 534; *Burton* v. *Wookey*, 6 Madd. 367; *Russell* v. *Austwick*, 1 Sim. 52; *Locke* v. *Lyman*, 4 Irish Ch. 188; *Am. Bank Note Co.* v. *Edson*, 56 Barb. 84.)

*James C. Carter* for plaintiff and the executors of Tracy, deceased, defendants. The findings of the Special Term upon the matters of fact were not disturbed by the reversal, and cannot, therefore, be reversed in this court. While those findings stand the judgment cannot be assailed. (Code, § 1338; *Platt* v. *Platt*, 58 N. Y. 646; *Van Tassel* v. *Moody*, 76 id. 614.) In construing contracts when neither fraud nor mistake are alleged, if the language which the parties have deliberately selected to express their thoughts is not to be relied upon, the difficulty cannot be met by resorting to evidence infinitely less certain. (*Norton* v. *Woodruff*, 2 N. Y. 153; *Couch* v. *Delaplaine*, Id. 397–404; *Giles* v. *Comstock*, 4 id. 270.) When a party alleges that he has been relieved from the operation of an express and important stipulation in a written contract by the positive oral agreement, or by an agreement implied from the acts and conduct of the other parties, he must show the fact of such agreement by clear and unambiguous proofs. (*Laffan* v. *Naglee*, 9 Cal. 662, 678.) The stock of the Northern Company is not to be viewed as profits. (*Ball*

SICKELS — VOL. LXIV.    67

Statement of case.

v. *Farley,* 1 South. Rep. 253; *Evans* v. *Hanson,* 42 Ill. 234; Bates on Copartnership, § 802.) Porter could not, at the time of the purchase, acquire for himself a title relieved of the trust in favor of the copartnership. (*Mitchell* v. *Read,* 61 N. Y. 123; *Laffan* v. *Naglee,* 9 Cal. 662; *Norris* v. *Rogers,* 107 Ill. 148; Bates on Copartnership, §§ 303–306, 792.) Equity does not hesitate to inquire whether advantages which a partner has apparently acquired after dissolution were not really secured before by an exercise of. the power which his associates had intrusted him with; just as in the case of ordinary trustees it will inquire whether a purchase of trust property, made after a discharge from the trust, was not really pre-arranged. (Collyer on Partnership, § 180; Story on Partnership, §§ 174– 176; *Howell* v. *Harvey,* 5 Ark. 282.) In respect to the plaintiff's appeal, his complaint as to the common stock stands dismissed. This is the final judgment against him so far as that stock is concerned, and severs this part of the judgment of the Special Term from that part relating to the preferred stock. No further judicial inquiry can be had in respect to that common stock while this judgment of the General Term stands. (*Weaver* v. *Barden,* 49 N. Y. 286–296.)

*Burton N. Harrison* for executors of Tracy, deceased. The judgment and order of the General Term are not only in effect, but strictly and from every point of view final as to all the matters as to which they are appealed from by the executors of Tracy, and their appeal to this court is, therefore, an appeal from a final judgment. (*Produce Bank* v. *Morton,* 67 N. Y. 203; *Weaver* v. *Barden,* 49 id. 286.) The facts found by the Special Term have not been disturbed by the General Term, and are conclusive upon this court if there is evidence sufficient in law to sustain them. (*Kane* v. *Cortesy,* 100 N. Y. 132; *Lewis* v. *Barton,* 106 id. 73; *Prosser* v. *First Nat. Bank,* 106 id. 677.)

*Delos McCurdy* for Porter and others, defendants. Any article of a partnership agreement, however express, is capable of being abandoned by the consent of all the parties, and this

Statement of case.

consent may be evidenced not only by express words but by conduct. (Lindley on Part. [4th ed.] 820, § 5 ; *Coust* v. *Harris*, T. & R. 523 ; *Geddes* v. *Wallace*, 2 Bligh, 270 ; *Jackson* v. *Sedgwick*, 1 Swanst. 460 ; Parsons on Partnership, 238 ; *Coventry* v. *Barclay*, 1 Beav. 33 ; 3 De G., J. & S. 320 ; *Pilling* v. *Pilling*, 3 id. 162 ; *England* v. *Curling*, 8 Beav. 133, 137 ; *Pettyt* v. *Thompson*, 6 Madd. 146.) All the facts and circumstances surrounding a contract may be considered by the courts to arrive at an understanding of the real intention of the parties. (*Reed* v. *Insurance Co.*, 95 U. S. 23 ; *U. S.* v. *Peck*, 102 id. 64.) A partnership for a single adventure terminates whenever the enterprise is brought to a close. (Parson's on Part. 384.) All the members of the pool were directors of the Northwestern Railway Company, and as such they were, within the authorities, trustees of the stockholders. They would have no right to sell property whether consisting of its interest in profits or the profits themselves after division, to this pool of which they were members. It would be their duty as directors to obtain as large a price as possible, and their interest as members of the pool to obtain it for as low a price as possible. Equity will not permit the conflict of duty and interest in trustees. (*Cumberland Coal and Iron Co.* v. *Sherman*, 30 Barb. 553 ; *Ogden* v. *Murray*, 39 N. Y. 202 ; *Bliss* v. *Matteson*, 45 id. 22 ; *Buffalo, etc., R. R.* v. *Lamson*, 47 Barb. 533 ; *Blake* v. *Buffalo Creek R. R. Co.*, 56 N. Y. 485 ; *Vaneps* v. *Vaneps*, 9 Paige, 238 ; *Torrey* v. *Bank of New Orleans*, Id. 649 ; *Ringo* v. *Binns*, 10 Peters, 269 ; *Gardner* v. *Ogden*, 22 N. Y. 327.) The appeal of the defendants Porter and others from that portion of the order of the General Term which denied the motion for a new trial, under section 1021 of the Code, is properly taken. (*Raynor* v. *Raynor*, 94 N. Y. 249 ; Code, § 190 ; *Kelsey* v. *Sargent*, 104 N. Y. 603.) A motion to dismiss an appeal or motion for new trial is within the discretion of the court to which the application is made, and is not appealable to this court. It is simply a question of practice and is not reviewable here. (*Tucker* v. *Leland*, 75 N. Y. 165.)

*Delos McCurdy, John C. Spooner* and *Joseph H. Choate* for defendants. The defendants, who joined in the motion for a new trial under section 1001, are entitled, under section 190, to appeal from the order of the General Term denying that motion, which, if granted, would have disposed of the claim of the plaintiff in respect of the preferred stock in the same way as it did dispose of the claim in respect to the common stock. (*Kelsey* v. *Sargent*, 104 N. Y. 663 ; *Raynor* v. *Raynor*, 94 id. 248.) The plaintiff did not, by virtue of the pool agreement of January, 1875, have any interest in the purchase by Porter of the 18,425 shares of common stock from the Northwestern Company in June, 1878, and Porter came under no liability to account to him for any part thereof. (*Greddes* v. *Wallace*, 2 Bligh, 295 ; *Reed* v. *Insurance Co.*, 95 U. S. 30, 31 ; *U. S.* v. *Peck*, 102 id. 64 ; Lindley on Part. 643–645, 649, 656, 854, subd. 17 ; id. [4th ed.] 820, § 5 ; Parsons on Part. 238, 384, §§ 3, 400 ; *Jackson* v. *Sedgwick*, 1 Swanst. 469 ; *Coust* v. *Harris*, T. & R. 523 ; *Marquans* v. *N. Y. Man. Co.*, 17 Johns. 525 ; *Griswold* v. *Waddington*, 16 id. 438 ; Taylor's Ev. § 1085 ; *Cook* v. *Berlin Woolen Mill Mfg. Co.*, 43 Wis. 440 ; *Murray* v. *Vanderbilt*, 39 Barb. 140 ; *Torrey* v. *Bank of New Orleans*, 9 Paige, 649.) The authority of Porter to surrender the preferred stock on behalf of the associates was unquestionable under the third clause of the articles which provided that the business and affairs of the copartnership should be exclusively managed by Porter, who is invested with full power and authority to act for and bind this copartnership in all matters pertaining to the copartnership business. (*Reddington* v. *Mar. L. & M. Co.*, 19 Hun, 405.) The plaintiff, as a director of the Northwestern, is conclusively presumed, in law, to have known of the advance to the West Wisconsin of $50,000, and to have assented to it. (*Ashhurst* v. *Mason*, L. R., 20 Eq. Cas. 225 ; *Phosphate of Lime Co.* v. *Green*, L. R., 7 C. P. 43 ; *Burt* v. *British, etc.*, 4 De G. & J. 158.) A transaction of this character, made in good faith, and apparently, at the time, the only possible one, will not afterwards be disturbed by the courts, when times and circum-

stances have changed, even though, in the light of subsequent events, it may appear to have been unconscionable, but the courts will protect the transaction and hold the parties concluded by it, especially where, as in this case, there has been ratification of it, with knowledge of its bearings. (*Kent* v. *Quicksilver Co.*, 78 N. Y. 159, 190.)

*Adrian Van Sinderen* for defendants. The agreement of January 6, 1875, was not intended by the signers thereof as a copartnership agreement, and should not be construed as such. (*Roe* v. *Roe*, 14 Hun, 612 ; 17 Duranton, Droit Fr. art. 320, Dig. 2, 17, 33 ; *Reed* v. *Insurance Co.*, 95 U. S. 30 ; Pothier De Soc., n. 2 ; 1 Lindley on Part. 15, 19 ; Story on Part. §§ 1, 2, 5, 30, 32, 38, 342, 343 ; *Prouty* v. *Swift*, 51 N. Y. 594 ; *Savings Bank* v. *Walker*, 66 id. 424, 430 ; *Sage* v. *Woodin*, Id. 578.) There was no joint liability ; and without proof of that no recovery can be had against the defendants as partners. (*Huse* v. *Guyot*, 3 Super. Ct. [T. & C.] 790 ; *Burnett* v. *Snyder*, 76 N. Y. 344 ; *S. C.*, 81 id. 550 ; *Walker* v. *Spencer*, 86 id. 166 ; *Manhattan B. Mfg. Co.* v. *Sears*, 1 Sweeney [31 N. Y. Super Ct.] 426.)

RUGER, Ch. J. On the 6th day of June, 1878, the defendant Porter purchased of the defendant, The Chicago & Northwestern Railway Company, certain shares of stock in The West Wisconsin Railway Company, and took a transfer thereof from trustees who held them for such vendor. So far as appears, he paid the full value therefor at the time of the purchase, from his own funds, and negotiated the purchase in his own name and for his individual benefit.

This action was brought by the plaintiff against the defendant Porter and certain other defendants in 1880, upon a written agreement of partnership made in 1875, to obtain an accounting in respect to partnership transactions, and raises the question as to how far a member of such firm was restrained from dealings on his individual account, by the terms of the agreement. The property dealt in consisted of shares

of stock in the West Wisconsin Railway Company, and the issue in the case is, whether the firm acquired any interest in the stock so purchased by the defendant Porter. In the course of the trial and argument all other questions were eliminated from the case, and the only dispute is now between the defendant Porter and his co-defendants, the executors of Tracy, and is presented by the appeal of said executors from the judgment of the General Term, reversing a judgment of the Special Term which awarded a proportionate share of such stock to Tracy's executors, and holding that the same belonged to the defendant Porter.

It is claimed by such executors that the order of reversal, not specifying that it was made upon the facts, must be assumed to have been made upon the law alone, and, therefore, that the findings made by the trial court are not open to review here, and must be assumed to state the facts upon which this appeal is to be determined. If this were all there is of this branch of the case, the contention would undoubtedly be correct, but it is subject to the further consideration that special findings of fact, on the material questions in the case, were requested to be made by the defendant Porter, which were generally refused by the trial court, and to each of which refusals the defendant Porter duly excepted. Wherever such requests were based upon uncontradicted evidence, or constituted legitimate and necessary deductions from the facts proved or found, the refusal by the trial court to make such findings, was error in law and is reviewable in this court. There is no conflicting evidence upon any material fact in the case, and the main cause of difference between the Special and General Terms, seems to grow out of the different views entertained by those tribunals respectively as to the legal effect of the several transactions established by the evidence. A brief history of those transactions will bring us naturally to the special questions in the case which require a more particular examination of the evidence upon which the findings were predicated. Prior to January 6, 1875, the West Wisconsin Railway Company was a corporation organized under the

laws of the state of Wisconsin, owning and controlling a line of railway extending from Hudson to Elroy in said state, and there forming a junction with a line of railway owned and operated by the Chicago & Northwestern Railway Company running to Chicago. The capital stock of the road consisted of 50,000 shares of the par value of $100 each, 10,000 shares being classed as preferred stock and 40,000 as common stock. This stock had all been transferred by the company to one Baldwin in payment of claims held by him under a contract with said company for building and equipping its road. The company had, at the time of the transactions hereafter referred to, a mortgage indebtedness of about $6,000,000, and was owing, in addition thereto, a floating debt of about $1,800,000. The interest on such mortgages had become due and payable, and the holders as well as the creditors of the floating debt threatened legal proceedings for the collection of their claims, and the company had no funds to meet their demands. The West Wisconsin Railway had, theretofore, to some extent, been a feeder for the Chicago & Northwestern Railway, and was susceptible of being made more valuable in that respect, and, therefore, certain directors and stockholders of the latter railway company conceived the idea of getting control of the Wisconsin company for the purpose, among other things, of making it subserve more largely the interest of the latter road. For the purpose of accomplishing this object the defendants Porter, Howe, Flower, Scott, Dows, Tracy, and the plaintiff Kennedy, all being directors in the Chicago and Northwestern Company, and one Emma A. Schley, the sister of said Flower, entered into a partnership agreement, which, so far as its material parts are concerned, was substantially as follows:

"*First.* The persons whose names are hereunder written, hereby agree to form themselves into a copartnership, to commence at the date hereof and continue until the same shall be dissolved by the written agreement of persons representing a majority in amount of the sums hereunder subscribed.

"*Second.* The business of this copartnership shall be the

purchase and sale of, and general dealing in the common and preferred stocks of the West Wisconsin Railway Company, and no other.

*Third.* The business and affairs of this copartnership shall be exclusively managed by Henry H. Porter, " who is hereby invested with full power and authority to act for and bind this copartnership in all matters pertaining to the copartnership business."

" *Fifth.* The said Porter is required to keep accounts of all his transactions in the business of the copartnership, and the final account in the closing of the partnership dealings is to be open to the inspection of each partner.

" *Sixth.* In case of the decease of any subscriber hereto, the interest of the decedent shall not cease, but the same shall continue under the direction of his legal representatives."

The several parties named subscribed and paid in to said Porter in the aggregate the sum of $100,000 as the capital of such copartnership, of which sum Porter subscribed $35,000, Kennedy, the plaintiff, $10,000; Scott, $10,000; Howe, $5,000; Flower, $7,500; Dows, $10,000; Baylis, $5,000; Mrs. Schley, $7,500; Tracy, $10,000. Immediately after the execution of the agreement, the said Porter, as attorney for the copartnership, paid to said Baldwin the said sum of $100,000, and received a transfer from him of certificates therefor, to the amount of 10,000 shares of preferred stock and 36,850 shares of common stock in the West Wisconsin Railway Company. The balance of said Wisconsin stock, consisting of 3,150 shares, being retained by said Baldwin for the benefit of certain members of his family, to whom he had transferred it. This constituted the only purchase of stock made by Porter under said copartnership agreement. In April, 1875, Scott, one of said partners, sold and transferred his interest therein to one P. L. Cable, and Cable, thereafter, in October, 1876, sold and transferred one-half thereof to the defendant Porter. So, also, the defendant Howe, in October, 1875, sold and transferred his whole interest in said partnership to the defendant Flower, who also in October, 1876, transferred said interest to the

defendant Porter.   Thus Porter became possessed, in October, 1876, of an interest equal to $45,000 in the capital of said copartnership.   Prior to the 9th day of October, 1875, Porter, in furtherance of the objects of said copartnership, and with the view of enabling the West Wisconsin Railway Company to raise funds for the purpose of meeting its floating and bonded debt, and avoiding a sale of its property and the destruction of the value of its common stock, surrendered to such company the certificate for 10,000 shares of preferred stock held by him for said firm, and the same was accepted by said company and canceled on its books.   By a resolution of the directors of said company, adopted March, 1876, the president thereof was authorized to reissue preferred stock to the amount of 10,000 shares, or so much thereof as might be necessary, at a restricted rate of dividend, for the purpose of paying the unfunded and floating debt of said company, and this resolution was the only authority at any time conferred by said company, for the reissue of any of such preferred stock. Thereafter and until the latter part of the year 1877, the preferred stock of said company was from time to time disposed of by its president to some extent for the purpose of paying, or postponing the period of payment of, its floating debt.

On or about the 9th day of October, 1875, the copartnership, represented by Dows & Howe, two of its members, effected an executory contract of sale of one-half of its whole copartnership assets to the Chicago & Northwestern Railway Company, for the sum of $100,000, payable at specified periods thereafter to the said Dows, as an agent of the firm. This purchase-money was fully paid by said company before October 5, 1876, to said Dows, and, as it was from time to time received by him, was distributed and paid over to the several members of the copartnership firm and their assignees, according to their respective proportions in its capital.

Immediately after the completion of the payment of the purchase-price to said Dows, the said Porter, in further execution of the contract of sale, caused a certificate for

18,425 shares of the common stock held by said copartnership, to be surrendered to said West Wisconsin Railway Company, and canceled upon their books, and in lieu thereof caused a new certificate to be issued for 18,425 shares to Dows & Flower as trustees, and delivered the same to them. Cotemporaneously with the distribution of the final payment made to said Dows of said purchase-money, said Porter also caused the remaining 18,425 shares of common stock belonging to said copartnership to be divided into lots corresponding to the *pro rata* interest of each copartner therein, and distributed the same among them and their assignees, each receiving and receipting for his *pro rata* share thereof.

This distribution of money and assets embraced all the visible and known property of the said copartnership and everything which its members then had reason to suppose would ever accrue to it. During the year 1877, it became evident that the West Wisconsin Company would be unable to pay its debts as its creditors required, or preserve its property from sale, and it was, therefore, considered desirable by its directors to reorganize the company and establish it on some different basis. It was proposed that its property and franchises should be sold under a foreclosure of the mortgages thereon, and that a committee on behalf of the stock and bondholders should purchase the same and organize a new company, which should take a transfer of the property of the former road from such committee. It is unnecessary to state in detail the plan of reorganization, further than to say that, in pursuance thereof, the Chicago, St. Paul & Minneapolis Railroad Company was organized under the laws of Wisconsin, with a capital of $5,000,000, represented by 10,000 shares of preferred stock and 40,000 shares of common stock of the par value of $100 each The plan of reorganization contemplated the execution of a new mortgage to replace the one foreclosed, and the division of its preferred stock among the holders of preferred stock in the West Wisconsin road for even amounts, and of the common stock at

the rate of ninety shares in the new company for 100 shares of the stock of the original company.

At this time the preferred stock was all held by Porter, as president, for the purposes contemplated in the resolution authorizing its reissue, and by certain creditors to whom it had been issued as collateral security for loans or in payment of debts of the West Wisconsin Company. This scheme was carried out and perfected in March, 1878, and the stock of the West Wisconsin railroad thereafter ceased to have any legal existence as stock of an existing corporation, and the new company took possession of the property formerly belonging to the West Wisconsin Company, and issued and delivered its certificates of shares of common stock to each of the corporators according to their respective claims therefor.

In February, 1878, before the consummation of the reorganization, John F. Tracy died, having by his will appointed the defendants Charles and Daniel D. Tracy executors thereof, and such will was duly proved in March, 1878. On the 16th of June, 1879, the defendant Porter delivered to said Tracy's executors certificates of preferred stock in the Chicago, St. Paul & Minneapolis Railroad Company, the successor to the said West Wisconsin Railway Company, to an amount equivalent to Tracy's *pro rata* share in the capital stock of said copartnership.

It will be seen that, although the copartnership agreement was couched in broad and general terms and authorized and apparently contemplated, speculative dealings in the stock of the West Wisconsin Railway generally, the business of the firm, as shown by its actual transactions, was of the most natural and legitimate character, and contemplated a profit originating only from the ownership of the railroad and such increase in its business and value as might be produced by the exercise of industry, skill and prudence in its management and operation. For the purpose of accomplishing this purpose the most extreme powers were conferred upon Mr. Porter, and no complaint is, or can justly be made that he exhibited any want of skill, sagacity, or good faith in

the management of the affairs of said copartnership, and in the conduct of its operations to its termination. Within two years he had not only preserved the road from dissolution, but had caused to be returned to each partner the entire amount of his capital, and also certificates of shares in the railroad, whose stock was the subject of the venture, amounting, at its par value, to upward of eighteen times the amount of such capital. While such stock was, at the time of its distribution and for some time thereafter, of but little value, it was proved at the time of the trial in 1882 that the stock into which it was made exchangeable had largely appreciated, and this result was due, in a large measure, to the energy, skill and sagacity displayed by the defendant Porter in its management.

The surrender by Porter to the West Wisconsin Company of the preferred stock was, if made in good faith and for the interest of the copartnership firm, within the scope of the power conferred upon him, and effected a valid transfer of title to that company. As we shall see hereafter, this transfer was subsequently approved and ratified by the several members of the partnership firm, and they were not at liberty on the trial to question either the validity of the transfer or the exercise of the powers granted to Porter. Some complaint was made upon the trial that Porter had not kept an account of the partnership dealings as required by the articles of copartnership. It does not appear that any members of the firm had ever inquired for such an account, or had ever desired information of firm transactions which he did not obtain, or professed any ignorance of the situation of the partnership dealings until about the time this litigation commenced. It does appear affirmatively that Porter made but one purchase of stock for the copartnership, and that he exhausted in such purchase the entire capital of the firm. It also appears that he never, individually, made any sale of copartnership property, or received any funds from sales of such property, or otherwise, on behalf of such firm. The only sale of such property that ever took place having been made by the mem-

bers themselves, acting through a committee selected by themselves, and receiving and distributing through an agent, duly appointed by them, the purchase-price received upon such sale.

The complaint that a book account of the transactions was not kept by Porter seems to be without any reasonable foundation, as there were no accounts which he could keep. The duties of Porter, under the partnership articles, consisted of the devotion of his time to the management and operation of the West Wisconsin Railway, and taking care of its financial affairs; and no complaint is made but that the books of that company exhibited a faithful record of those transactions.

We come now to a more particular consideration of the evidence upon which Tracy's executors base their present claim. On the 6th day of June, 1878, Flower & Dows, being authorized by the Chicago and Northwestern Company so to do, transferred to Porter the certificate for 18,425 shares of the stock of the West Wisconsin Railway Company, held by them as trustees, and it was claimed on the trial by the plaintiff, Kennedy, and the defendants, Tracy's executors, that Porter could not purchase or acquire such stock, individually, by reason of his obligations to his associates growing out of the provisions of the copartnership agreement. They, therefore, claimed their proportionate share of such stock under the partnership agreement. All of the remaining copartners acquiesce in the claim made by the defendant Porter, that by the transfer of the shares held by the trustees to him, with the assent of the *cestui que trust*, he acquired an absolute title thereto, free from any claim on the part of the members to participate therein. In view of the question thus raised, it is important to consider more particularly the contract under which the Chicago and Northwestern Company acquired an interest in such stock and see whether thereby, the copartners had divested themselves of all interest therein.

This contract was formed by written negotiations, consisting of an offer of sale on behalf of the copartners, and resolutions of acceptance on behalf of the Chicago and Northwestern

Railway Company. The evidence shows that on the 5th day of October, 1875, Messrs. Dows & Flower addressed and delivered to the board of directors of the Chicago and Northwestern Railway Company a letter, which, so far as its material parts are concerned, was as follows: "At the solicitation of John F. Tracy, H. H. Porter, general manager and several other directors in the Northwest road, we were induced to take an interest in the West Wisconsin Railway, learning that they were to default on their interest January 1, 1875, in order to control its business in the interest of the Northwestern Railway. We were told that it would not do at that time for the Northwest to purchase it, for the reason that they had no money, but that it was very important that the Northwest should not lose its connection with St. Paul city; that it would do if this road was allowed to escape us, and we would lose $500,000 of our earnings now received yearly from that source. A party was formed to purchase the West Wisconsin Railway, which succeeded in doing it. * * * Up to this time we have controlled *the road* in the interest of the Northwestern Railway, * * * and we feel that it would be better now for the Northwestern to make some arrangements to either *purchase the whole of our stock or half of it*, or to provide for the purchase of it now and paying for it at some future time. We desire to submit to you the following propositions: First, that you pay to David Dows, monthly, ten per cent of the amount you earn from the joint business of the West Wisconsin Railway until you have paid $100,000 at seven per cent interest from January 1, 1875; that you pay him now ten per cent of the earnings you have received from the joint business of the West Wisconsin Railway, from January 1, 1875, which shall entitle you *to one-half the profits on the stock of the West Wisconsin Railway held by us.* * * * We would prefer that the Northwestern Railway provide for laying aside of its joint earnings $200,000, and interest from January 1, 1875, in which event we will give you *the profits on the whole of our stock* in the West Wisconsin Company. * * * On this,

or a similar basis, we hereby agree, for the owners of the West Wisconsin Railway stock, to execute the proper papers for the purpose of carrying out this proposition."

At a meeting of the directors of the Chicago and Northwestern Company, held October 9, 1875, at which every continuing member of the copartnership firm except Mrs. Schley, who was represented by R. P. Flower, was present, and constituting a majority of such board of directors, this proposition was taken up and discussed and the following resolutions were thereupon unanimously adopted : " First. Those gentlemen shall give to the Chicago and Northwestern Railway Company all the unconsigned business to and from their road to the points reached by the lines of that company, so far as they can legally control the same, and will use their influence and exertions in that direction. Second. In consideration of above the Chicago and Northwestern Railway Company shall pay each month to the order of Mr. Dows fifteen per cent of all the earnings of the Chicago and Northwestern Railway Company from the business going to or coming from the West Wisconsin Railway Company, until the payments amount to $100,000, and interest thereon at the rate of seven per cent per annum, interest to begin from June 1, 1875, and the payment to be made from that time. Third. When the $100,000 shall be paid in full, and interest, Messrs. Dows & Flower to execute a declaration in trust, in writing, that they will pay over to the Chicago and Northwestern Railway Company one-half of all the profits at any time made by them on the stock of the West Wisconsin Railway Company, held by them for an association which they represent, holding $3,685,000 of said stock."

These resolutions were received and acted upon by the copartnership firm as an acceptance of their offer to sell a one-half interest in their partnership venture. Whatever view might be taken of the propriety of this transaction by the stockholders of the Chicago and Northwestern Railway, who were alone entitled to raise objections thereto, it is unnecessary to inquire, as they not only have never challenged it, but,

on the contrary, have sanctioned and approved it. It certainly does not lie in the mouth of any member of the partnership firm to question the validity of this transaction or the existence of the facts upon which it was based, for they each and all participated therein, not only as the proposed vendors but also as representatives of the proposed vendees, and sanctioned and approved all that was said or done in their behalf. This contract must, in accordance with settled rules of construction, be interpreted so as to carry out and effectuate the intention of the parties making it. We must seek for that intention, first, in the language used in forming their agreement, and, secondly, in the object which that language discloses as the occasion and design of the contract. It is also proper, in searching for the intention of the parties, to consider the circumstances surrounding the transaction, with a view of arriving at the true meaning and intent of the language employed, if its significance is in any respect doubtful or obscure. Extrinsic evidence is not available to interpret the meaning of a contract unless technical terms are used, or a latent ambiguity is developed upon the trial which requires such evidence to make the application of the language to the subject-matter of the contract intelligible and certain. Subject to these qualifications, the interpretation of written agreements presents a question of law alone, and belongs to the courts to determine.

The learned judge who made the findings of fact on the trial seems, in arriving at the terms and meaning of the contract of sale, to have excluded the language used in the offer from consideration, and determined the language and meaning of the instrument by an examination of the resolutions of acceptance alone. In this we think he erred. The offer was an essential prtt of the contract, and cannot be divorced from it in determining the question of intent. It is expressly referred to in the resolutions of acceptance, and a court would willfully shut its eyes to needed light, which refused to examine legitimate sources of information for its aid and guidance.

Viewed in the light of the rules stated, there would seem to be no reasonable doubt of the true meaning and intent of

this contract. The object of the copartners in purchasing the stock originally was said to be to control the West Wisconsin road in the interest of the proposed vendees, and the object of selling was to relieve the copartners from further responsibility, either wholly or partially, in the management of the stock, and throw it upon those for whose benefit it was originally undertaken. It was the evident intention of the vendors to convey such an interest in the stock as would enable the vendees to control the future management of the West Wisconsin Railway. Stripped of unnecessary verbiage it was a proposition to sell to the Northwestern Company the entire interest of the copartnership in the West Wisconsin road for the sum of $200,000, and in case the proposed vendees did not desire to take the whole, then to sell them one-half thereof for $100,000. The latter proposition was the one accepted; and thereby the Northwestern Company became, upon payment of the purchase-price, the owners as tenants in common with the copartners, of one-half of the copartnership property, whatever that might be.

It was clearly the intention of all parties to hold and operate the whole copartnership interest together in unison for the benefit of the Northwestern Railway Company, until other arrangements should be made; and that whatever should ultimately be realized from such assets, called profits, in the acceptance, from whatever source they might be derived, should be equally divided between the partners on one side and the Northwestern Railway Company on the other. To hold otherwise would involve the absurdity of supposing that a vendee has voluntarily accepted a lesser interest, for the same price, than was offered to him, and preferred to have the profits to accrue from the use of property, rather than the property together with the profits, or that he voluntarily accepted a form of transfer which would not enable him to effect the purpose for which it was avowedly made. It is obvious that the word profits was used by the vendors in the sense in which they were related to the speculation, and as representing the assets of the firm after

it had been reimbursed its original outlay ; and it is equally clear that the vendees understood the language in the same sense, as they required that their trustees should be obligated to pay to them one-half of all the profits at any time made on the stock of the West Wisconsin Railway Company, held by such trustees for an association which they represent, holding $3,685,000 of said stock. The parties were then speaking of a speculation being prosecuted by the vendors, and provided for an obligation that such vendors should pay to the vendees one-half the profits made by them upon their investment.

The assets were then in the hands of the agent of the firm, and it was clearly contemplated that he should continue in their possession and use them for the purpose originally designed, of making them profitable to its owners, and useful to the Chicago and Northwestern Railway. The profits thus anticipated were those referred to in the agreement. In the offer the vendors obviously used the terms " their interest in the West Wisconsin Railway Company," " their stock " and " the profits," as synonymous terms, and their offer was accepted in a similar sense. Any other construction would involve the absurdity of supposing that as vendors they meant one thing, and as vendees intended to put a different meaning upon the same language.

The mode provided for carrying out the contract did not, it is true, in terms, require a direct transfer of the shares to the vendee, but did what was equivalent thereto in requiring a transfer to be made to trustees of their selection, under an obligation on the part of such trustees to pay over to the vendees one-half of all profits thereafter to be derived from the common enterprise. They thus secured the entire beneficial interest in one-half of such property and became in equity, as well as in law, the owners thereof. (*Adamson* v. *Armitage*, 19 Vesey, 418; *Page* v. *Leafingwell*, 18 id. 463.) This view of the contract is confirmed by the subsequent action of the vendors in distributing the copartnership assets among its several owners as hereinbefore stated. They thereby transferred the legal title of the stock to trustees for

tbe vendees, and subjected it to its management, control and ownership. (Perry on Trusts, § 920.)

But, whatever view may be taken of the meaning of the original contract, it was entirely competent for the contracting parties, in performing it, to put their own construction upon its terms, and agree upon any mode of performance which might be mutually satisfactory to them. The vendors, in fact, did, upon the payment of the purchase-price, divide what was before a common venture into two equal shares, one of which they divided among themselves according to their *pro rata* interest in the speculation and took and held as their individual property, and the other half they conveyed to trustees for the vendees as the lawful owners of such share. They had thus disabled themselves from continuing the speculation jointly with their vendees as they had agreed to do, and withdrew their entire share of the partnership assets from the venture. They certainly could not have expected that the further prosecution of the adventure was to be conducted for their benefit or subject to their control, in the absence of their share of the capital. After such division the members of the copartnership firm realized all of the profits to which they were entitled and ceased to have any interest in or title to the common stock formerly owned by the firm. By the terms of the contract, when the whole purchase-price of the stock was paid to the copartners, it was provided that Messrs. Dows & Flower should execute a declaration of trust; such declaration was entirely unnecessary to constitute a valid trust of personal property, neither was it necessary that it should be evidenced by any formal or written agreement declaring the trust. A declaration or admission of the trust made by the trustees, if upon sufficient consideration, would establish a valid trust. (*Day* v. *Roth*, 18 N. Y. 448.)

The requirement that a declaration should be made was for the benefit of the vendees, and it was competent for them to waive its performance without hazard to their rights. In view, however, of the accomplishment of the purposes of the corporation effected by the transfer of stock to persons holding it in the interest of the Northwestern road, and the evident

determination of all parties interested to abandon the copartnership enterprise in October, 1876, the execution of such declaration was deemed unnecessary, but for the obvious reason that it was necessary for some persons to represent the Northwestern Company in the direction of the West Wisconsin Railway Company, and as that could not properly be done by another corporation, it was by mutual consent agreed that the certificate for 18,425 shares should be delivered to Messrs. Dows & Flower, as trustees for said vendees, and the remainder of the common fund of 36,850 shares should be distributed among the several copartners according to their respective interests in the copartnership assets. A complete disposition of the entire assets of the copartnership was thus made and a severance of the interests of the various owners was thereby effected, and each party thereafter took and held his and its stock in severalty relieved from any obligation to use it for the purposes of the copartnership firm. This division of assets was utterly inconsistent with an intention to continue such partnership business, and it must be held that a dissolution of the copartnership firm was thereby intended to be effected. (Story on Partnership, § 280; Parsons on Partnership, 384.)

In the contract of sale it was assumed by all parties thereto that the preferred stock was canceled and extinguished, and that their interest in the copartnership was wholly represented by the 36,850 shares of common stock referred to therein. It is, however, contended by the appellant that, inasmuch as the partnership agreement provided that it should be dissolved only by a "written agreement of persons representing a majority in amount of the sums hereunder subscribed," that it necessarily continued as a binding obligation upon its members until the execution of such written agreement. It is not disputed but that whatever time, may be fixed by partnership articles for the existence of a copartnership, it may, nevertheless, be sooner dissolved by the happening of any of the events which in law are held to effect that result. Elementary writers quite uniformly agree as to the causes which effect the

dissolution of partnerships. Among other things, it is said that when the further prosecution of the enterprise becomes illegal or impossible, or when its object has been fully accomplished, it has arrived at the period which was necessarily contemplated for its dissolution. Among other causes which effect such dissolution it is said that in the absence of an express agreement to the contrary, a partnership is *ipso facto* dissolved by the assignment by one partner of his share in the enterprise, by the taking in execution of that share under a *fi fa;* by the transfer of such share by death, bankruptcy or insolvency. (Lindley on Partnership, 187.) It is stated by Parsons on Partnership (page 407): "We suppose the truth to be that if a partner retires, whether by voluntary act, bankruptcy, expulsion or death, or if a new partner comes in by any means whatever, in either of these cases the old partnership ceases to exist." And further, at page 438: "What was said of the necessary dissolution of a partnership, when any change was made in it, is true of the change caused by the death of a partner. Dissolution follows immediately and inevitably. This rule has been distinctly declared only of late years, for it was in 1808, or about that time, that Lord ELDON declared in several cases that the death of any one in any number of partners dissolves the partnership. And even then that chancellor put in the qualification that the death of a partner operates a dissolution of the partnership unless provision is expressly made to the contrary. We doubt very much whether this qualification be necessary or accurate, for we do not believe that any provisions made beforehand, in reference · to the death of a partner, or any agreements or arrangements made subsequently to his death can prevent this dissolution. We have, perhaps, sufficiently indicated our reasons for this view in another place. Here we need only add that as the partner who has died cannot by possibility continue a member of the firm, so any firm of which he is not a member, whether it contains his executors or his children, cannot be the same firm as that of which he was a member. What is inaccurately called provision against the dissolution of the

partnership is an agreement that if either party dies his property shall remain in the firm and in the business for the benefit of his children, or that his children, or some one of them, or some other person, shall immediately on his death, take his place in the firm and become partner in his stead. All these agreements and arrangements, and all that can be made for a similar purpose, are, in fact, only bargains for the creation of a new partnership when the old one ceases to exist."

Story says, in section 317 of his work on Partnership : " There is no doubt that, by the principles of the common law, the death of any one partner will operate as a dissolution of the partnership, however numerous the association may be, not only as to the deceased partner, but as between all the survivors." He also says, in section 307, that " it seems now well established at the common law, that if one partner does make * * * a voluntary assignment of all right, title and interest in the partnership property and effects, that will at once dissolve the partnership and convert the assignee or purchaser into a tenant in common with the other partners."

It was said by Judge HOGEBOOM, in *Savage* v. *Putnam* (32 Barb. 420, affirmed 32 N. Y. 501), " the ordinary affect of the death of one of the members of a partnership is to work its dissolution. The partnership is ended. The connection has been dissolved and the future relations of the surviving partners to each other must be determined by some new agreement between them, or by the results which the law pronounces upon their acts and proceedings when no new agreement is in fact made. And so of a change in the concern effected by the transfer of stock." (*Marquand* v. *Mfg. Co.*, 17 Johns. 525 ; *Menagh* v. *Whitwell*, 52 N. Y. 147 ; *Morss* v. *Gleason*, 64 id. 204 ; *Tarbell* v. *West*, 86 id. 280.)

Whenever a dissolution of a partnership is once effected, it is not competent for the survivors to enter into any new enterprises, or contract any new obligations on behalf of the original firm. In such case the survivors take the partnership assets for the purpose only of discharging its obligations, completing its unfinished business and winding up the affairs of the con-

cern, and if they make use of such assets in new enterprises it usually is at the option of the representatives of the retiring partner to claim a proportionate share of the profits in such enterprises or not. (*King* v. *Leighton,* 100 N. Y. 386.) A majority of the court are of the opinion, however, that, inasmuch as the questions relating to a dissolution of this copartnership, arising from death, transfers of interest and the introduction of new members therein, were not especially referred to upon the trial or argued before us, that our decision should be placed upon the ground of dissolution effected by the severance of the partnership interests, the distribution of its assets and the actual abandonment of the enterprise evidenced by the unmistakable action of the respective members of the firm. We are, therefore, of the opinion that by the return of the original capital to its several members, and the final distribution of its assets, the partnership ceased to exist, and its members had no power thereafter to contract new obligations or enter into new speculations by virtue of its original contract. How far the old or new members of a copartnership may bind themselves, through acquiescence or implied consent, to further operations under the original articles, it is unnecessary here to inquire, for no such transactions were undertaken, and all that was subsequently done here was in pursuance of the rights of the survivors to realize upon the assets and settle up the outstanding obligations of the original firm.

It is, however, claimed by the appellants that the distribution by the defendant Porter, in 1879, of the preferred stock acquired by him upon the reorganization in the Chicago, St. Paul & Minneapolis Railway Company, among the several copartners according to their *pro rata* interest, furnishes conclusive evidence that said copartnership was then an existing organization for all of its original purposes.

We are of the opinion that this claim cannot be maintained. If Porter had, after the dissolution of the firm, made new purchases and entered into new engagements in the name of the firm, or had used its funds in such new enterprises, there

might have been some foundation for such a claim. This, however, was not the case. As one of the committee for the bondholders and stockholders of the West Wisconsin Railway Company, Porter had, in 1878, secured from the Chicago, St. Paul & Minneapolis Railway Company an obligation to have the preferred stock of the former, recognized in the purchase by the latter company. The terms upon which this reorganization was to be effected were the subject of negotiation up to the spring of 1878, and it was not until that time that any such property came into existence which could be the subject of ownership by the old firm. The copartnership had, long prior thereto, surrendered its preferred stock to the old company upon terms which contemplated its consumption and use for the benefit of such company, and no longer had any legal right to its return. Stock, however, which represented this preferred stock, did thereafter come into the hands of the old company, and Porter secured its distribution among the members of the copartnership firm upon the assumption that they were its equitable owners. It was, at the best, an apparently uncollectible asset, which, through a fortunate combination of circumstances, had proved collectible, and, coming into the hands of one of the original partners, was, upon principles of equity, distributed by him among his associates. This action was not at all inconsistent with the theory that the firm had been previously dissolved, for a firm always continues to exist for the purpose of collecting, settling up and distributing its assets and performing its antecedent engagements. (*Griswold* v. *Waddington*, 16 Johns. 438; *Hubbard* v. *Matthews*, 54 N. Y. 43; *King* v. *Leighton, supra.*) It was said by the chancellor in the first cited case, " a dissolution of partnership only has respect to the future, the parties remain bound for all antecedent engagements. The partnership may be said to continue as to everything that is past, and until all pre-existing matters are wound up and settled." Whether the members of the original firm were actually entitled to any participation in this stock, and if so, to what extent would, we think, be a serious question if critically examined, but it

seems to be quite unnecessary to go into it, for we understand it is not now involved in the case.

There remains but a few words to say with reference to the criticisms made by the appellants upon the contract between the Chicago & Northwestern Company and Porter, for the sale to him in June, 1878, of the stock in question. There is no doubt but that a bargain was made for its purchase by Porter, and that it was, in fact, caused to be transferred by that company to Porter with intent to vest the title in him for a consideration agreed upon between them. The court below so found. There is no claim that Porter used the assets of the copartnership firm in its purchase, and the legality of that transfer is now recognized and affirmed by both its legal as well as its equitable owners. We know of no ground upon which Tracy's executors can question the validity of that transfer or now claim that Porter should account to them for the stock or its value while asserting the invalidity of the contract by which its title was acquired. We have heretofore discussed the case upon the assumption that if the firm had continued an existing organization, neither its individual members nor its general agent could lawfully purchase in their own names and hold for their individual benefit property similar to that which was the subject of the partnership dealing. But we do not understand that there is any invariable rule which leads to such a conclusion. Whenever fiduciary relations exist between parties which render a course of conduct on the part of one a violation of some contractual duty which he owes to his associates, or where a member of a partnership engages in secret and clandestine dealings with others which must result to the injury or detriment of the general business of the firm, such person has generally been held responsible to his associates for profits made in such enterprises. But it cannot be doubted but that such individual has, with the consent of his associates or copartners, the right to make individual purchases of property and to engage in individual speculations therein, and most

certainly he could properly make such purchases of his copartners and hold the property so purchased, and enjoy its profits free from any claims by his associates. It furnishes a striking commentary upon the merits of the appellants' argument that they make no claim to share in the profits made by Porter upon the purchase of stock formerly owned by Scott and Howe and Flower, and which seem to us to be quite as susceptible to such claim as the stock purchased of the Chicago & Northwestern Company. If it were necessary to examine this question, we are by no means clear that the purchase in question is justly subject to the criticisms made upon it by the appellants; but, in view of the conclusions reached on the other branches of the case, we refrain from discussing the subject.

We are, therefore, of the opinion that the judgment, so far as appealed from by the defendant Tracy, should be affirmed.

All concur, except DANFORTH, J., dissenting.

Judgment affirmed.