## WATKINS v. DELAHUNTY.

(Supreme Court, Appellate Division, Second Department. June 18, 1909.)

1. PLEADING (§ 237*)—TRIAL AMENDMENT—GROUNDS.

Where defendant would not have been surprised by a variance, the complaint should be amended to conform to the proof if necessary.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 603; Dec. Dig. § 237.*]

2. PARTNERSHIP (§ 328*)—CONTRACT—TERMS—ACCOUNTING—SUFFICIENCY OF EVIDENCE.

In an action for an accounting under an agreement for the purchase, rehabilitation, and sale of a railroad, evidence *held* to show that the original contract between the parties contemplated the purchase of the railroad itself, the formation of a corporation to take title, and the ultimate sale of the road and the sharing of the profits and losses.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 781; Dec. Dig. § 328.*]

3. PARTNERSHIP (§ 269*)—INCORPORATION OF PARTNERSHIPS.

Where a partnership agreement contemplated the purchase of a railroad, the formation of a corporation to take title and re-establish the property, and the sharing of profits upon its ultimate sale, the partnership was not ipso facto terminated by the organization of a corporation and transfer to it of the partnership assets, though it would have been terminated and merged in the corporation by distributing the corporate stock and bonds according to the respective interest of the partners.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 269.*]

4. PARTNERSHIP (§ 328*)—ACCOUNTING—BURDEN OF PROOF—DISSOLUTION OF PARTNERSHIP.

In an action for an accounting under an agreement by which the parties were to purchase a railroad, form a corporation to take title, and rehabilitate it and thereafter sell the road, sharing profits or losses, the burden was on defendant to prove that the copartnership was merged in the corporation subsequently formed, either by agreement of the parties or by the distribution of the partnership assets between the partners.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 779; Dec. Dig. § 328.*]

5. PARTNERSHIP (§ 328*)—ACCOUNTING—SUFFFICIENCY OF EVIDENCE—DISSOLUTION.

In an action for an accounting under an agreement which contemplated the purchase of a railroad, the formation of a corporation to take title and rehabilitate the road, and its subsequent sale, evidence *held* to show that the partnership was continued after the organization of the corporation and was not then dissolved and merged into the corporation.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 781; Dec. Dig. § 328.*]

Gaynor, J., dissenting.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Special Term, Kings County.

Action by Thomas C. Watkins against John Delahunty. On reargument of plaintiff's appeal from a judgment (108 N. Y. Supp. 619) dismissing the complaint. For former decision, see 114 N. Y. Supp. 1150. Reversed and new trial ordered.

Argued before WOODWARD, JENKS, GAYNOR, RICH, and MILLER, JJ.

Robert B. Honeyman, for appellant.

Charles F. Brown (Edmund Luis Mooney, on the brief), for respondent.

MILLER, J. This appeal presents only questions of fact. The record is voluminous; the transactions involved are complicated. The learned trial judge was in doubt, and dismissed the complaint on the ground that the plaintiff had not established his case by a fair preponderance of the evidence. I think that the documentary evidence and the conceded facts so strongly support the plaintiff's contention as to require a new trial.

A point is made that the complaint does not fairly allege the cause of action sought to be recovered upon. The point is not of present importance, however, because the court ruled upon the trial that the complaint was sufficient, refused for that reason to allow the plaintiff to amend, and admitted the evidence objected to. If necessary, the pleadings should have been amended to conform to the proof, as it is difficult to see how the defendant could well claim surprise.

On the 17th of August, 1899, the defendant, on behalf of himself, Charles D. Haines, and the plaintiff's assignor, William C. Roberts, purchased at referee's sale so much of the Lebanon Springs Railroad as was within this state, and on September 21, 1899, organized a corporation, the Chatham & Lebanon Valley Railroad, to which the title was transferred. On July 1, 1901, the defendant and Roberts, Haines having meanwhile released to them his interest, sold the road by a sale of its stock and bonds. The plaintiff's contention is that in August, 1898, said parties entered into an agreement to acquire the railroad, to rehabilitate, improve, and equip it, and ultimately to sell it and to share the resulting profits or losses. The action is for an accounting.

The defendant denies that there was ever a copartnership, but admits that what he calls a "joint venture" was formed to purchase, not the railroad, but certain tax titles, receiver's certificates, and other obligations of it, with the view of making a profit on a sale thereof. He asserts that the parties did not originally contemplate the purchase of the railroad itself, and that when it was purchased and transferred to a corporation the original contract was terminated, both by agreement of the parties and by operation of law. Thus there are two important questions of fact involved: First, What was the original agreement? And, second, Was it terminated by agreement, if not by operation of law, upon the formation of the corporation?

The railroad extends from Chatham, Columbia county, through Rensselaer county in this state, to Bennington, Vt. When the trans-

action in suit arose, the part in this state was in the hands of a re-
ceiver appointed in a creditor's suit. It had been condemned by the
railroad commission, only a few miles were in operation, and the part
in Rensselaer county had been sold for taxes. The original agree-
ment, if in writing (the point is in dispute), was not produced, but the
correspondence between the parties and the surrounding circumstances
leave no room to doubt that their purpose from the start was to ac-
quire the road, to rehabilitate it, and to sell it. With that in view,
they commenced, in August, 1898, to purchase the tax titles, receiver's
certificates, and other obligations of the road; and the defendant, who
is a lawyer, says that from then until the referee's sale he spent sub-
stantially all of his time straightening out the legal complications in
the way of perfecting title and procuring a sale by the referee. Haines
proved to be unable to contribute anything, and a further agreement
in writing was made on November 18, 1898. That agreement recites
that the parties have theretofore agreed to purchase certain tax titles,
receiver's certificates, and other obligations then existing or which
may thereafter exist against said railroad or the receivers thereof in
this state and in the state of Vermont, "each of said parties to con-
tribute equally to the funds necessary to make such purchases, and
bear equally any losses that may arise in consequence thereof," and
that Haines is unable to contribute his pro rata share, and then pro-
vides as follows:

"Now therefore, it is agreed between said parties, that the party of the
first part" (meaning Roberts) "shall provide the money which is now nec-
essary on the part of the party of the second part" (meaning Haines) "to
contribute for his share of such funds, and that on the sale of the prop-
erties thus purchased, the losses shall be borne by and the profits divided
between said parties as follows: Three-sixths thereof to the party of the
first part, one-sixth thereof to the party of the second part, and two-sixths
thereof to the party of the third part" (meaning the defendant). "All of the
deeds and transfers of said property on said purchases shall be taken in the
name of the party of the first part individually, but it is agreed that the
same are held in trust, subject to the terms of this agreement. Before a di-
vision of the profits, each party shall be reimbursed the full amount which
he has contributed to the enterprise."

That agreement was drawn by the defendant, and its recital of an
agreement to buy tax titles, etc., is the basis of the claim that the par-
ties originally contemplated the purchase, not of a railroad, but of its
obligations. But the tax titles were more than mere obligations of the
railroad. Upon acquiring them, the parties acquired the railroad it-
self. Indeed, the defendant himself says that the purchase of such
titles prevented any one else from buying the road. Manifestly, the
receiver's certificates and other obligations were to be acquired for
the purpose of clearing up the title. The parties understood that the
tax titles, receiver's certificates, and other obligations represented the
road. The road was in such condition that it was not practical to
acquire ownership of it except in the way adopted by these parties,
and it seems to me that the contract of November 18th is to be con-
strued precisely as though it had recited an agreement to purchase
the road itself. If there could otherwise be any doubt on this point,
the memorandum drawn and signed by the defendant on the purchase

at the referee's sale, in August, 1899, sets it at rest. That memorandum recites that the signer had purchased the road "as trustee for Messrs. Wm. C. Roberts, Charles D. Haines & myself pursuant to an understanding and a certain agreement between us heretofore made with reference to said railroad." It may be taken as conclusively established, then, notwithstanding the defendant's denial, that the original agreement contemplated the purchase of the railroad, and the trial court so found.

The defendant says that he thought the transaction had made him "rich beyond the dreams of avarice," and it is evident that in the early stages of it the parties expected to realize handsome profits. Of course they knew that that could only be done by organizing a corporation to take title, rehabilitate the road, and put it in operation, and the trial court found that that was contemplated by them. We may now re-examine the agreement of November 18th. That provides, not for the transfer of the property to a corporation and the issuance of its stock and bonds to the parties in proportion to their contributions and interests, but for the sale of the properties purchased and a sharing of profits or losses resulting therefrom. That actual, not paper, profits were contemplated, is further shown by the provision for reimbursement before any division of profits. The trial court found that the transfer of the property to the corporation in exchange for its securities was not the sale contemplated by the parties, but was made, as they understood, to comply with the railroad law of the state. The corollary to that finding is that the ultimate sale of the road, by a sale of the stock and bonds of the corporation to Dr. Webb, was such a sale as the parties contemplated, whereupon profits or losses were to be shared. The argument of the defendant, based upon the fact that the written contracts in evidence and the complaint are both silent respecting the formation of a corporation to take title and operate the road pending the sale contemplated, is met by the established fact that that was an incident, a mere detail, of the plan, the ultimate result of which was to be a sale of the property and a sharing of actual, not paper, profits or losses.

We have it then conclusively established by the evidence and found by the trial court that the original contract contemplated the purchase of the railroad itself, the formation of a corporation to take title and rehabilitate it, the ultimate sale of it, and a sharing in the profits or losses resulting from the entire transaction.

As the original agreement contemplated the continuance of the copartnership until the final sale, it was not ipso facto terminated by the organization of the corporation and the transfer of the partnership assets to it. There was a nominal issue of $1,000,000 capital stock for the title acquired at referee's sale, and an issue of $350,000 of bonds was authorized, of which $250,000 was nominally issued for the tax titles previously acquired. Thus the copartnership assets were converted into $1,000,000 stock and $250,000 of bonds. The copartnership might then have been terminated by agreement, and undoubtedly it would have been merged in the corporation by a distribution of the stock and bonds of the corporation according to the respective

interests of the parties. Kennedy v. Porter, 109 N. Y. 550, 17 N. E. 426. Instead of deciding the contrary, as is contended, that case is a square authority for the proposition that a copartnership may own the stock of a railroad and by means of such ownership operate it. We are now dealing only with questions arising between the parties themselves.

In view of the answer to the first question, I think the burden was on the defendant to prove that the copartnership was merged in the corporation either by agreement of the parties or by a distribution of the copartnership assets. But as I view the evidence, that question is unimportant.

The defendant says that about the time of the purchase of the road at receiver's sale, and before the corporation was organized, he informed Roberts that his disbursements amounted approximately to $10,000; that it was then agreed between them that he should have $10,000 of bonds to cover his disbursements and 3,000 shares of stock as his share of profits, and that Roberts should take sufficient bonds to cover his advances, whatever the amount might be, and should take his share of the stock, which was subsequently put at 6,000 shares; and that soon after the organization of the corporation a division of the stock and bonds between him and Roberts was made in accordance with that agreement. The defendant's claim is that he then regarded his interest in the corporation as a permanent investment, that he supposed Roberts was financing the company by selling bonds, that he had no knowledge of what was done to improve, equip, and operate the road, and that his "cry was for dividends."

When that agreement is claimed to have been made, Haines was still a partner, but the agreement took no account of him. If stock had then been divided among the three partners as profits, upon the basis stipulated in their written contract, the ratio would have been 3, 2, and 1, and when Haines was later eliminated, as stated infra, the ratio would have been 3 to 2, as is conceded by the parties and found by the court. There is no pretense that there was ever a division or an agreement to divide upon either basis.

At the time of the purchase of the railroad Roberts had contributed upwards of $115,000 in cash; the defendant had contributed not to exceed $5,850, besides some small disbursements in cash, and his individual note for $10,000. Although there is a claim to the contrary, the defendant's letter in evidence conclusively shows that that note was contributed by him as a part of his advances to the enterprise. He claimed that, when the agreement for division was made, Roberts agreed to, and in fact did, take up that note and return it to him with his stock and bonds, or at about the time that he received his stock and bonds. But it was established that the note was renewed on September 8, 1899, by a demand note for $10,000 made by the defendant, which, together with other notes, all secured by bonds, was carried by the bank until the final sale of the road, when Roberts had to redeem the bonds in order to deliver them pursuant to his agreement, as hereinafter stated. The defendant attempted to show that he had made a cash contribution of $10,000, but to do that he had to include $2,000 advanced after the making of the alleged contract, all of his

minor disbursements, personal expenses up to the following December, and over $500 interest reckoned to the following December, and then he fell short $200.

On the 29th of November, more than two months after the organization of the corporation, Roberts and the defendant bought out Haines and eliminated him from the enterprise. The agreement to which all were parties was drawn by the defendant. It recited the prior agreements, the commencement of an action to rescind them so far as the party of the first part (Haines) was concerned, "so that the said agreements shall affect only the parties of the second part" (Roberts and the defendant), an agreement between the parties that said agreements "shall so be rescinded so far as concerns the party of the first part," and then provided that in consideration of the payment of $3,000, which Roberts and the defendant agreed to pay on December 4, 1899, "the party of the first part hereby agrees to and with the parties of the second part, that said contracts be and the same hereby are, so far as the same relate to said party of the first part, in all things rescinded, vacated, annulled and set aside." Roberts advanced the $3,000, and it certainly cannot be claimed that that money was loaned by him to the corporation.

If the agreement claimed had been made, the stock and bonds would have been issued and divided pursuant to it as soon as practicable after the formation of the corporation, and certainly when Haines was eliminated. It was established that the only certificates of stock issued upon the organization of the corporation were certificates for a few shares each to qualify some dummy directors, who do not appear ever to have attended a directors' meeting. No certificates at all were issued or delivered to the defendant or Roberts until July, 1900, almost a year after the organization of the corporation, and the defendant admits that at that time the Vermont end of the road had been acquired, wherefore it was necessary to make out a new set of books to comply with the requirements of the Interstate Commerce Commission and to make it appear that at least $10,000 of stock per mile had been issued. In fact, Roberts and the defendant had attended the receiver's sale of the Vermont end of the road in April, 1900; the defendant had bid in the road in the name of Roberts individually; Roberts paid the purchase price and took a deed in his own name, the defendant attending to all of the legal details; and the title stood in Roberts' name until the final sale of the road, when he conveyed it to the corporation. It is to be noted, therefore, that the mortgage to secure the bond issue did not cover the Vermont end of the road.

No bonds were delivered at all until December 5, 1899, when 5 $1,000 bonds were delivered to the defendant, and were by him pledged as security for his individual note, on which he borrowed $5,000 of his personal friend, Mr. Canfield; on the 28th of December he got 5 more bonds and gave his receipt for them; on the 1st of May, 1900, he got 10 bonds, and pledged them to Mr. Canfield as security for his individual note of $10,000; in September, 1900, he got 6 bonds, and pledged them to Mr. Canfield as security for a $6,000 note made by the corporation and indorsed by him and Roberts; at other times, which do not appear, he got bonds, and when the road was

finally sold, in addition to the bonds pledged to Mr. Canfield, he had, not 10, but 14 bonds. The bonds not taken by the defendant were all deposited by Roberts in the bank as security for loans.

Manifestly both of the parties knew that there was no market for either the stock or the bonds. While Roberts attended personally to the expenditures in improving and operating the road, I cannot believe that the defendant was ignorant of the fact that the money with which to do that, aside from the small amount raised by the defendant, was borrowed by Roberts on his personal credit, using the bonds as collateral. The money which the defendant was able to borrow was not put into the treasury of the company, but was deposited by him in the bank to the credit of Roberts individually.

On July 1, 1901, the road was sold to Dr. Webb for $250,000, free and clear. Roberts agreed to deliver all of the stock and bonds, and personally guaranteed the title, and assumed the payment of all claims against the road. The purchaser retained $25,000 as security for that guaranty, pending the termination of some suits against the corporation in which the defendant appeared as attorney. Those suits were not all closed up until June, 1906, when the final payment was made on the contract. It was then for the first time possible for the partners to have a final accounting, and Roberts immediately demanded one. In order to deliver the stock and bonds according to the agreement, Roberts had to redeem those which had been pledged as security for loans. He says that the defendant represented to him that $31,300 was required to redeem the stock and bonds pledged to Mr Canfield, and a check was made to the defendant for that amount, and he obtained and deposited the stock and bonds.

I have undertaken to state what appear to me to be the controlling circumstances in the case. There are many other details, all tending to strengthen the view which I have indicated, but which cannot be enumerated without extending this opinion beyond reasonable limits. It is manifest that as between the parties the corporation was but a paper affair and its issue of stock and bonds only nominal. The evidence plainly shows that the stock and bonds were never divided between the parties in accordance with the agreement as claimed by the defendant, or the actual contributions of the parties, or the original agreement. The conduct of the parties throughout is consistent with the continuance of the copartnership and irreconcilable with the claim that it was terminated and merged into the corporation.

It seems to me that the established facts, when considered in the light of the original agreement as found by the trial court, admit of but one conclusion, and required a judgment in favor of the plaintiff. Hence I vote for a new trial.

Judgment reversed and new trial granted; costs to abide the final award of costs. All concur, except GAYNOR, J., who votes for affirmance.